# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-3606

_____

Lesa Davis,                                          *
                                                     *
         Plaintiff - Appellant,              *
                                                     *   Appeal from the United States
     v.                                         *   District Court for the Eastern
                                                     *   District of Arkansas
                                                     *
KARK-TV, INC., doing business as                     *
Morris Multimedia; Nexstar                           *
Broadcasting Inc., originally sued as                *
KARK-TV, Inc., doing business as                     *
Nexstar Communications, Inc.,                        *
doing business as KARK-TV, Inc.                      *
                                                     *
                                                     *
        Defendant - Appellees.              *

_____

Submitted: May 13, 2005

Filed: August 30, 2005

_____

Before LOKEN, Chief Judge, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Lesa Davis appeals the district court's[1] grant of summary judgment in favor of KARK-TV on her claims of race discrimination and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e, and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code. Ann. §§ 16-123-101 et. seq. We affirm.

I.

Lesa Davis was hired at KARK-TV in 1977 as a part-time camera operator. Shortly thereafter, she started to work for United Parcel Service ("UPS"). She remains employed by UPS. In 1979, Davis became a full-time camera operator at KARK-TV on the nightshift. Not long after, Davis began to perform audio duties and was promoted to Production Coordinator. As Production Coordinator, Davis was responsible for ordering supplies, booking time for clients to make commercials, and assisting the Production Manager. As part of this promotion she began to work the day shift.

In the mid-1980s Morris Multimedia purchased KARK-TV. Morris made a number of changes at KARK-TV including starting a morning program. Davis was assigned to do graphics and audio for that show. As part of a normal annual review, in 1994, Davis was offered a one percent raise. She informed the station that she did not want to receive a raise if it was only one or two percent. Although she accepted a two and one half percent raise later that year, she continued to refuse raises of two percent or less. In 1997, Troy Thompson became the Production Manager at the station. She repeated her request to not receive a raise of two percent or less to Thompson. She told Thompson that she did not want a raise of less than two percent because it would put her in a higher tax bracket and would reduce her take-home pay.

---

[1]The Honorable Susan Webber Wright, Chief Judge, United States District Court for the Eastern District of Arkansas.

In 1998, KARK bought computers so the employees would be better able to produce graphics. By 2000, the station's news directors requested more graphics for their programs. Davis testified that, as a result of the increased demands from the news directors, it became a problem for her to complete all the graphics work and then produce the audio. In addition, Thompson believed he should be responsible for some of the tasks being done by Davis, such as scheduling personnel and commercial production. As a result, Thompson gave Davis a choice of producing the audio or generating the graphics for the morning show. Davis chose to focus exclusively on the graphics.

In August 2001, Rick Iler became the Director of News Operations at KARK-TV. In Spring 2002, the station moved into a new building. As part of the move, the station restructured its operations. Iler wanted graphics to become part of the news department because most of the graphics produced were news graphics. After the decision was made to move graphics from the production department to the news department, Iler met with Thompson and Carl Bruce, the station's General Manager, to determine how the move would impact employees. They determined that two employees, Trey Williams and Brian Stafford, should automatically be moved to the news department from the production department because they were graphic artists who were hired to build graphics.

The station decided to transfer two of the three remaining graphics personnel, who were known as character generators, to the news department. This group consisted of Lesa Davis, Kim Pearson, and Annette Gatlin. These employees operated the system and pulled up graphics for the director during the show. Although Thompson testified that he was in the process of training them to do more graphics, their primary job was to run the graphics machine during the news cast. Their jobs, as opposed to the graphic artist positions, were fairly interchangeable. In other words, on any given day a person might run a camera, audio, or operate a character generator. The station moved Annette Gatlin and Kim Pearson, white

-3-

females, to the news department. Davis was assigned to run the teleprompter with the promise that she would be moved to camera operator on the morning show.

In June 2003, Nexstar Broadcasting Group, Inc. ("Nexstar") purchased KARK-TV. Nexstar brought in Perry Chester to be the General Manager. Chester evaluated the jobs at the stations and concluded that three positions should be eliminated: graphic artist, teleprompter, and website developer. The graphic artist and website developer employed by the station were terminated. Instead of terminating Davis, Chester offered her a position as a camera operator. Davis told Chester that the new position, which required working in the evening, created a conflict with her position at UPS. Chester advised Davis to check with UPS to see if an arrangement could be made to avoid any scheduling conflicts. Davis accepted the camera operator position and was given a raise as part of that transfer to $10.00 per hour. Davis worked the camera operator job for approximately two weeks and then took a leave of absence for foot surgery. She did not return to work at KARK-TV.

Davis filed a claim of race discrimination against Morris Multimedia for failing to promote her to the position of graphic artist with the Equal Employment Opportunity Commission ("EEOC"). She received a right-to-sue letter from the EEOC on August 26, 2002. Davis later filed a claim of race discrimination against Nexstar for failing to promote her to the position of graphic artist. She received a right-to-sue letter from the EEOC pertaining to this claim on April 29, 2004. Davis filed a lawsuit on November 22, 2002 against Morris Multimedia. She amended her complaint to add Nexstar as a defendant on November 25, 2003. Davis filed a second amended complaint on July 14, 2004 to add a claim of retaliation against Nexstar.

Davis alleges that Morris discriminated against her on the basis of race when she was not given an opportunity to interview for the for the position of graphic artist in the news department, a promotion, and for Morris's refusal to give her raises. Davis asserts that Nexstar discriminated against her when it failed to place her in the

-4-

position of graphic artist or audio operator on the morning show when it purchased KARK-TV. She claims Nexstar's actions when it moved her from the morning news show to the evening show as a camera operator were in retaliation for her filing complaints against KARK-TV and amounted to a constructive discharge.

## II.

We review de novo the district court's grant of summary judgment. Pope v. ESA Services, Inc., 406 F.3d 1001, 1006 (8th Cir. 2005). Summary judgment is appropriate if there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party." Winthrop Resources Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004). We review the evidence and the inferences that reasonably may be drawn from the evidence in "the light most favorable to the nonmoving party." Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003).

We analyze Title VII disparate treatment claims, § 1981 claims, and ACRA claims in the same manner. Henderson v. Simmons Food, Inc., 217 F.3d 612, 615 n.3 (8th Cir. 2000) (noting that claims premised under the ACRA are analyzed in the same manner as Title VII claims); Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1997) (noting that the McDonnell Douglas analysis is applicable to Title VII disparate treatment and § 1981 claims). We employ the familiar McDonnell Douglas burden-shifting framework to conduct our analysis. Turner v. Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-04 (1973)). "Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." Pope, 406 F.3d at 1006-07 (citations omitted). Once a plaintiff successfully establishes a prima facie case, the burden

shifts to the employer to articulate "a legitimate, non-discriminatory reason for its adverse employment action." Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994). If the employer meets its burden, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." Pope, 406 F.3d at 1007. The plaintiff has the burden of persuasion at all times. Id.

A. Claim of Discrimination for Failure to Promote Against Morris

To establish a prima facie case of discrimination, Davis must show that: (1) she is a member of a protected class; (2) she met the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees that were not members of the protected class were treated differently. Gilmore, 319 F.3d at 1046.

Davis, as an African-American, is a member of a protected class. We will assume for purposes of this opinion, as the district court did, that Davis can establish the rest of her prima facie case against Morris, although we are by no means certain that she has done so. Given this assumption, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for not selecting Davis for the graphic artist position. Williams, 14 F.3d at 1309.

Morris offered as a legitimate, non-discriminatory reason for her non-selection that she was less qualified than the other two candidates. One reason she was not selected was that the station believed that Davis was not as fast at learning how to produce and display graphics. This skill was significant in the station's decision because the station was looking to increase the amount of graphics it used during its newscasts. Rick Iler stated:

-6-

[p]robably the number one thing that popped out for me from listening to Troy's feedback and just from my observations, was speed. She was not very fast. And I knew that with the new news cast I had to have someone that would be able to pull up several different graphics, you know, at one time, would be able to learn and grasp the ability to build several different graphics because the position has always been, the position that she was in was just running a machine and you ran them from the night before . . . . This now would be actually creating all new graphics for a brand new show every single morning and from my observation and feed back from her direct manager, I did not feel that the speed in which she could get things done was going to work for that position. . . . I also took into consideration, like I said, feedback from Troy. Troy told me she was a good employee but that considering what I needed, knowing what expectations I had of these news shows, that his feedback was simple, she's a good employee but with what you're wanting to do he didn't think that she could do [the job].

Morris also asserted that it did not select Davis for the position because it did not find her to be sufficiently dependable.

"The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999). Morris's stated justifications meet its burden. Accordingly, the burden shifts to Davis to produce evidence sufficient to create a genuine issue of material fact whether Morris's proffered nondiscriminatory reason was a pretext for discrimination. Pope, 406 F.3d at 1007.

Davis fails to produce any evidence of pretext. Instead, Davis appears to argue that she was better qualified than the other candidates who were selected. In particular, Davis appears to argue that the people chosen, Pearson and Gatlin, were less qualified because they had spent less time as graphic operators. We cannot "sit as super-personnel departments reviewing the wisdom or fairness of the business

judgments made by employers, except to the extent that those judgments involve intentional discrimination." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). Here, there is no evidence that the persons selected were not qualified for the job. Further, seniority was never listed as a consideration in who would perform graphics in the news department. Thus, given the lack of evidence of pretext from Davis, we will not second guess Morris's hiring decision.

Davis also appears to argue that discrimination by KARK-TV in training led to the differences in qualifications. This argument fails because Davis does not provide any evidence of a denial of training. Accordingly, we conclude that the district court correctly held that Davis failed to demonstrate that Morris's proffered justification for not promoting Davis was a pretext for discrimination. Pope, 406 F.3d at 1007.

B. Claim of Pay Raise Discrimination Against Morris

Davis claims she was denied raises given to Pearson and Gatlin, white employees. Even if we again assume that Davis can establish a prima facie case, she has no evidence of pretext in regards to Morris's legitimate, non-discriminatory justification for its decision.

Morris's justification for not giving Davis raises was that she stated in 1994 that she did not want a raise if it was only one or two percent[2] and she had not earned a larger raise after 1994. Troy Thompson testified that he did not recommend Davis for a larger raise because Davis made more mistakes in her job performance than other employees, Davis had failed to attend mock news casts at the new KARK-TV facility, a requirement of her job, and he had taken over many of her duties. Further,

---

[2]There is nothing in the record to indicate that Davis changed her mind and was willing to accept a one or two percent raise.

he stated that she had a poor attitude toward her work. Davis only points out that Pearson and Gatlin received raises of more than one percent, she does not identify workers who received raises larger than the two percent. The only raise larger than two percent that she identifies was a two and one-half percent raise she received, and accepted, in 1994. Davis offers no evidence that race was a motivation for denying her pay raises. Accordingly, we conclude that the district court correctly found that Davis failed to demonstrate that Morris's stated legitimate, non-discriminatory reason for not offering her a raise was pretextual.

C. Constructive Discharge Claim Against Nexstar

Davis alleges that her transfer amounted to a constructive discharge because the schedule conflicted with her UPS job. "To show 'constructive discharge, a plaintiff must show more than just a Title VII violation by her employer.'" Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1159 (8th Cir. 1999) (quoting Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998). "A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation. Tatum v. City of Berkeley, 408 F.3d 543, 551 (8th Cir. 2005).

In this case, Davis cannot show that her transfer constituted an adverse employment action or that Nexstar created an intolerable working environment. This court has stated:

> An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.

Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005) (internal citations omitted). The elimination of Davis's teleprompter position and her transfer to a camera operator position involved only minor changes in working conditions and no reduction in pay or benefits. In fact, Davis admitted that the camera operator position was perceived as a higher-level position. Further, as part of the transfer Davis was given a seven percent raise. Thus, the transfer did not constitute an adverse employment action.

Further, Nexstar did not create an intolerable work environment. There is no indication Nexstar acted with the intention of forcing Davis to resign or that she intended to do so as a result of Nexstar's actions. Davis admits she did not have any problems with her coworkers, Thompson, or her treatment by Chester. Her only complaint was that she had to work the evening shift, which conflicted with her job at UPS. When Davis informed Chester that the new position conflicted with her position at UPS, Chester advised her to check with UPS and get back to him to see if an arrangement could be made to accommodate Davis, UPS, and the station. Rather than force her out, Chester's actions demonstrate a desire to work with Davis to resolve the issue so that she could remain at the station.

Davis quit rather than work with KARK-TV to find a solution that resolved her concerns. "An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996). Accordingly, Nexstar's actions in transferring Davis do not constitute a constructive discharge.

D. Retaliation Claim Against Nexstar

Finally, Davis asserts that Nexstar's decision to eliminate her teleprompter position was in retaliation for filing a complaint against Morris. To establish a prima facie case of retaliation, Davis must show that "[she] engaged in protected conduct,

that [she] suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." Griffith v. City of Des Moines, 387 F.3d 733, 738 (8th Cir. 2004). Without commenting as to the other elements that must be proven, we conclude that Davis failed to show that she suffered an adverse employment action. As discussed above, her transfer from the teleprompter position to camera operator was not an adverse employment action given that it was considered a higher-level position, it came with a raise, and the evidence suggests that the station was willing to work with Davis to avoid scheduling conflicts with her job at UPS. Accordingly, Davis fails to establish a prima facie case of retaliation by Nexstar.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____