# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-2107

———————

Marlow Morgan,                          *
*
           Appellant,              *
*   Appeal from the United States
    v.                            *   District Court for the
*   Eastern District of Arkansas.
A.G. Edwards & Sons, Inc.,       *
*
           Appellee.              *

———————

Submitted: November 15, 2006
Filed: May 17, 2007

———————

Before RILEY, HANSEN, and SMITH, Circuit Judges.

———————

RILEY, Circuit Judge.

Marlow Morgan (Morgan) appeals the district court's[1] adverse grant of summary judgment on Morgan's claim under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 to 634. We affirm.

## I.   BACKGROUND

In 1971, Morgan began working as a stockbroker for A.G. Edwards & Sons, Inc. (A.G. Edwards), an investment firm headquartered in St. Louis, Missouri. Over

---

[1]The Honorable George Howard, Jr., now deceased, United States District Judge for the Eastern District of Arkansas.

the years, Morgan was promoted several times, culminating with his promotion in 1978 to regional manager of A.G. Edwards's Southern Region. As a regional manager, Morgan's responsibilities included supervising fifty-two branches and branch managers in five states, opening new branches, recruiting new financial consultants and branch managers, addressing compliance and legal issues within his region, and being responsible for the profitability of branches under his supervision.

In March 2001, Robert Bagby (Bagby) was appointed A.G. Edwards's CEO. At the time of Bagby's promotion, the stock market industry was suffering and undergoing significant changes, and became even more volatile following the terrorist attacks of September 11. During this time period, several large corporations were investigated for corrupt business practices, resulting in significant losses for stockholders, greater scrutiny by regulators, and the devotion of more time and resources to addressing compliance and legal issues. See generally Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201 to 7266 (effective July 30, 2002).

As a result of these market conditions, A.G. Edwards suffered a 74% decline in profits in 2001 and decided to implement a reduction-in-force (RIF) in 2002 to reduce costs. The first phase of the RIF was a voluntary severance incentive plan (VSIP). On February 26, 2002, A.G. Edwards offered the VSIP to select non-branch employees, including regional managers such as Morgan, who were age 50 or older and had at least fifteen years of service. The VSIP gave employees the opportunity to terminate their employment voluntarily in exchange for certain severance benefits, which included one year's salary, a lump-sum bonus payment, health coverage and basic group life insurance for one year, and the right to continue to vest in an unvested portion of deferred compensation. Under the terms of the offer, employees had forty-five days to elect whether to terminate employment and accept the VSIP package, and had an additional seven days to revoke that acceptance.

Approximately eighty employees accepted the VSIP; Morgan did not. Immediately thereafter, A.G. Edwards implemented an involuntary severance

program.  Morgan was not among the individuals selected for termination under this program.

As a regional manager, Morgan prided himself in exhibiting a "hands-off" management style.  He characterized his management practice as hiring good branch managers and letting them run their own branches.  Some supervisors and branch managers enjoyed Morgan's "hands-off" style of management.  Others sought more guidance and input from Morgan, and complained Morgan seldom was in his own office, was difficult to reach by telephone, and rarely visited his branches.

During Morgan's tenure, Morgan's supervisors instructed Morgan to visit his branches more frequently and to maintain regular office hours.[2]  Bagby, while serving as director of branches and Morgan's supervisor, discussed performance issues with Morgan on at least one occasion, noting Morgan's poor office attendance and inaccessibility by telephone.  Morgan attributed these problems to his temporary involvement with the construction of his new home.

Marty Altenberger (Altenberger), who served as a branch administrator, acted as liaison between the branches and A.G. Edwards's home office.  During the time Altenberger worked in Morgan's region, Altenberger became increasingly frustrated with Morgan's lack of involvement with branch managers.  Branch managers would call Altenberger seeking approval in hiring decisions when they could not get in touch with Morgan.  According to Altenberger, he regularly fielded questions from Morgan's branch managers about issues Altenberger did not have the authority to

---

[2]The record indicates Morgan received at least three letters from his former supervisor, David Sisler (Sisler), in 1983, 1989, and 1992, in which Sisler expressed concern over Morgan's failure to visit several branch offices and Morgan's inaccessibility and time out of the office.  Morgan disputes the materiality of the letters, arguing they were written several years ago by an individual who was not Morgan's supervisor at the time of his demotion.  Notwithstanding Morgan's assertion, Sisler's letters demonstrate the concerns related to Morgan's inaccessibility and work attendance were not unprecedented or of recent origin.

handle, such as compensation and hiring deals. Altenberger informed Morgan some branch managers had complained about Morgan's inaccessibility and failure to visit the branches, and Altenberger encouraged Morgan to make more frequent visits. According to Altenberger, Morgan responded he had "been around long enough that he's earned the right not to have to visit the branches."

Altenberger informed Rob Pietroburgo (Pietroburgo), Morgan's supervisor, about Morgan's lack of accessibility and Altenberger's frustration in spending time responding to inquiries from branch managers. At the time, Pietroburgo had been involved in resolving problems in Morgan's region, which included issues related to the opening of an office in Somerset, Kentucky. Pietroburgo believed many of these problems with the Somerset office could have been avoided or minimized if Morgan had been more involved.

In March 2003, Pietroburgo informed Morgan he needed to improve his performance and become more involved with his branches. Between March and July 2003, Pietroburgo began documenting issues as they arose and having discussions with Morgan. In July 2003, Pietroburgo received a report regarding Morgan's performance at an annual meeting held by Morgan for branch managers and brokers. Altenberger attended the meeting, and believed Morgan was not very well-prepared for the meeting, noting Morgan's absence after the meeting's opening session. Altenberger also reported several branch managers commented on Morgan's absence from the meeting. In response, Morgan contends his practice was to attend only the meeting's opening session.

After hearing about Morgan's lack of attendance at the annual meeting, Pietroburgo concluded Morgan should be removed from his regional manager position. Pietroburgo based his decision on Morgan's lack of attendance at the annual meeting, Morgan's poor office attendance, the difficulty branch managers had in contacting Morgan, Morgan's failure to visit his branches regularly, and the problems that had occurred in opening the Somerset, Kentucky, branch. Pietroburgo informed

Bagby, who concurred in the decision. On July 29, 2003, Pietroburgo informed Morgan of his decision to demote Morgan to the position of financial consultant. Pietroburgo stated Morgan would continue to receive his regional manager's salary for one year to assist Morgan while he built his "book of business," that is, clients for whom Morgan personally would make investments.

Morgan believed the demotion was tantamount to a termination, given Morgan had not maintained a book of business as he had maintained early in his career as a stockbroker. According to Morgan, A.G. Edwards knew Morgan would be unlikely to succeed as a stockbroker in the new city to which he was moving with no existing book of business. Thus, Morgan inquired about the possibility of a severance package. For several weeks, the parties attempted to negotiate different terms of a severance. One such term required by A.G. Edwards was a covenant not to compete, the details of which are unclear from the record. The parties were unable to reach any agreement on a severance package. Because Morgan never reported for work during the four months following his demotion, A.G. Edwards terminated Morgan's employment on November 30, 2003.

Pietroburgo selected Medley, age 63, to replace Morgan, age 59. Only two other candidates, who were ages 57 and 61, were considered for the position. At the time of Morgan's demotion, he was the most tenured of the fourteen regional managers. Four of the remaining thirteen regional managers were older than Morgan, two regional managers were less than five years younger than Morgan, and seven regional managers were between seven and fifteen years younger than Morgan.

On April 12, 2004, Morgan brought suit against A.G. Edwards, alleging age discrimination in violation of the ADEA.[3] The district court thereafter granted A.G. Edwards's motion for summary judgment. This appeal followed.

## II.  DISCUSSION
### A.  Standard of Review

We review de novo the grant of a motion for summary judgment, applying the same standards as the district court. See Samuels v. Kan. City Mo. Sch. Dist., 437 F.3d 797, 801 (8th Cir. 2006). Summary judgment is appropriate if the evidence, viewed in the light most favorable to Morgan and giving him the benefit of all reasonable inferences, shows there is no genuine issue of material fact and A.G. Edwards is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party opposing summary judgment cannot rest solely on the pleadings, but instead must set forth specific facts showing there is a genuine issue of material fact for trial. Celotex Corp., 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment. Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999).

### B.  Age Discrimination Claim

The ADEA prohibits employers from discriminating against individuals on the basis of age with regard to their "compensation, terms, conditions, or privileges of employment." Jankovitz v. Des Moines Indep. Cmty. Sch. Dist., 421 F.3d 649, 653 (8th Cir. 2005) (quoting 29 U.S.C. §§ 623(a)(1), 630(l)). To establish a prima facie case of age discrimination, Morgan must show he (1) was at least forty years old, (2) suffered an adverse employment action, (3) was meeting his employer's legitimate

---

[3]In the district court, Morgan also alleged a claim under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 to 1461, but Morgan does not appeal the district court's order granting summary judgment to A.G. Edwards on his ERISA claim.

expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger.  See Haas v. Kelly Servs. Inc., 409 F.3d 1030, 1035 (8th Cir. 2005).

On appeal, Morgan contends the district court erred in finding (1) A.G. Edwards's VSIP could not be considered as evidence of age discrimination, (2) no direct evidence of age discrimination, and (3) Morgan failed to show a prima facie case of age discrimination because he was not replaced by a younger employee.  We address each argument in turn.

### 1.    The VSIP

The ADEA creates a safe harbor for an employer's early retirement program, allowing an employer "to observe the terms of a bona fide employee benefit plan . . . that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of [the ADEA]."  29 U.S.C. § 623(f)(2)(B)(ii).  Morgan argues A.G. Edwards did not prove its VSIP fell within this safe harbor provision, and thus, the VSIP should be considered as evidence of age discrimination.  Specifically, Morgan contends the program was neither voluntary nor consistent with the purposes of the ADEA.[4]  Both arguments fail.

_____

[4]On appeal, Morgan also contends the VSIP is not a "bona fide employee benefit plan" within the meaning of the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. §§ 621 to 634.  Because Morgan did not specifically raise this argument before the district court, he normally may not do so now.  See Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004) ("Ordinarily, this court will not consider arguments raised for the first time on appeal.").  We find no good reason to deviate from this general rule in Morgan's appeal.  Even if we were to consider this newly asserted argument, we find it unavailing.  "A 'bona fide employee benefit plan' is one in which substantial benefits are paid to employees who are covered by it."  Raskin v. Wyatt Co., 125 F.3d 55, 61 (2d Cir. 1997).  Here, employees electing to terminate their employment and to accept the VSIP's severance benefits would receive one year's base salary, a lump-sum bonus payment, health coverage and basic group life insurance, and the right to continue to vest in an unvested portion of deferred compensation.  We have no difficulty concluding such substantial benefits payable to

First, Morgan argues A.G. Edwards made misleading and coercive statements to persuade employees to participate in the VSIP. In support of his argument, Morgan points to language contained within A.G. Edwards's VSIP memorandum[5] to eligible employees and argues the threat of involuntary reductions, combined with A.G. Edwards's encouragement for employees to take advantage of the VSIP, eradicated any voluntary character of the VSIP. We disagree.

"To determine whether a retirement plan is voluntary, a court must consider whether, under the circumstances, a reasonable person would have concluded that there was no choice but to accept the offer." Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn, 136 F.3d 104, 113 (2d Cir. 1998). In offering the VSIP, A.G. Edwards stressed the program's voluntary nature, informing employees it was "not pressuring you or any employee to elect the [VSIP] and terminate your employment with A.G. Edwards. Whether you terminate your employment with A.G. Edwards and elect to accept the compensation and other benefits is entirely up to you." A.G. Edwards also allowed employees forty-five days to decide whether to participate in the VSIP and seven days after execution of the agreement to revoke acceptance, thus affording employees adequate time to consider their options and make an informed choice on whether to terminate their employment voluntarily, and even to change their minds. Employees were not required to accept

---

participating employees demonstrate the VSIP is a "bona fide employee benefit plan."

[5]A.G. Edwards's VSIP memorandum stated, in part:

> The [VSIP] will help A.G. Edwards achieve the required cost reductions while rewarding some of the firm's most long-term employees. We anticipate, however, that A.G. Edwards will implement other initiatives, including involuntary reductions in employment. The decisions concerning involuntary reductions have not yet been made and could be affected by the number of employees who participate in the [VSIP]. Employees eligible for, but who choose not to participate in, the [VSIP] along with other employees may be considered for any involuntary reductions.

the offer, and those who elected not to terminate their employment would continue to work and receive the benefits of their employment. Although the memorandum referred to the possibility employees who elected *not* to participate might be considered for any future involuntary reductions, a reasonable person would not have viewed this language as a coercive threat to "quit or be fired." Rather, the possibility of involuntary reductions arguably is an obvious and integral corollary of A.G. Edwards's cost-reduction initiative in the event the company did not achieve its desired goal of reducing costs solely through the VSIP. While a reasonable person, after viewing the terms of the plan, might feel less certain of his continued employment with A.G. Edwards, it nevertheless was possible enough eligible employees might accept the VSIP, thus obviating the need for A.G. Edwards to implement involuntary reductions. See Rowell v. BellSouth Corp., 433 F.3d 794, 806 (11th Cir. 2005) (rejecting an employee's constructive discharge claim brought following the employee's acceptance of an early retirement plan offered before the company instituted an involuntary reduction in force). A.G. Edwards was being open and frank with its employees, disclosing a potential future cost reduction alternative and supplying more information to assist the employees' consideration whether to participate in the VSIP.

We also reject Morgan's argument the VSIP memorandum misled employees into believing they would not be replaced. The memorandum specifically addresses A.G. Edwards's goal to reduce costs. Nothing in the memorandum gives the impression A.G. Edwards was attempting solely to downsize its number of employees. Furthermore, nothing suggests A.G. Edwards's goal of reducing costs was incompatible with later replacing some employees. Indeed, as A.G. Edwards points out, it is not difficult to imagine a situation in which some long-term employees may have voluntarily terminated their employment, and the company might have responded by combining the responsibilities of remaining employees, eliminating some remaining positions, and moving some remaining employees into positions voluntarily vacated by the long-term employees. Such a scenario may well result in an overall reduction of both costs and workforce. The VSIP was voluntary.

-9-

Second, Morgan contends the VSIP is inconsistent with the purposes of the ADEA because it resulted in arbitrary age discrimination and threatened long-term employees with the risk of being fired if they refused to accept the VSIP. The purpose of the ADEA is "to promote employment of older persons based on their ability rather than age," and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). "Arbitrary age discrimination occurs when an employer denies or reduces benefits based *solely* on an employee's age." Jankovitz, 421 F.3d at 654.

In Auerbach, the Second Circuit, in reviewing whether an early retirement incentive plan arbitrarily discriminated on the basis of age, examined whether the plan treated all plan participants equally once they met the eligibility requirements. Auerbach, 136 F.3d at 113. The court held, "An early retirement incentive plan that withholds or reduces benefits to older retiree plan participants, while continuing to make them available to younger retiree plan participants so as to encourage premature departure from employment by older workers[,] conflicts with the ADEA's stated purpose to prohibit arbitrary age discrimination in employment." Id. at 114. Because the plan at issue in Auerbach did not decrease benefits to employees as the age of the plan's participants increased, the Second Circuit found the plan satisfied the ADEA's stated purpose by not discriminating based on age. Id.

In Jankovitz, we performed a similar inquiry and found an early retirement plan arbitrarily discriminated against individuals on the basis of age by treating employees over the age of 65 differently from younger employees. Jankovitz, 421 F.3d at 654-55. The plan at issue in Jankovitz employed a "time-related window," where employees were offered special incentives to retire between ages 55 and 64, but where all benefits were cut off by an upper limit fixed age of 65. Because "[t]hat adverse change in benefits [was] based solely upon age," we concluded the plan violated the ADEA. Id. at 655.

Contrary to Morgan's argument, the VSIP differs substantially from the faulty Jankovitz plan and is more akin to the valid Auerbach plan. The VSIP does not favor

-10-

younger employees over older employees. Rather, employees who were age 50 or older with fifteen or more years of service were eligible for the VSIP. The VSIP offered the same incentives to all eligible persons and did not employ an age-based phase-out where plan benefits decreased over time or were reduced to zero upon a certain age in order to encourage employees to participate in the plan. Because the VSIP does not arbitrarily discriminate on the basis of age, the plan is consistent with the purposes of the ADEA.

The VSIP is a lawful early retirement incentive plan, and thus falls within the safe harbor provision of 29 U.S.C. § 623(f)(2)(B)(ii). The district court properly declined to consider the plan as evidence of age discrimination.

### 2. Existence of Direct Evidence of Age Discrimination

A plaintiff asserting an ADEA claim may attempt to prove intentional discrimination by either of two methods. Kneibert v. Thomson Newspapers, Mich., Inc., 129 F.3d 444, 451 (8th Cir. 1997). The plaintiff may present direct evidence that age was a motivating factor in the challenged employment decision. Id. (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989)). In the alternative, the plaintiff may rely on the three-stage proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. Morgan contends the district court erroneously applied the burden-shifting framework of McDonnell Douglas given the existence of direct evidence of age discrimination, including: (1) testimony by "agents" of A.G. Edwards that the company was terminating older employees to transition to a younger workforce; (2) testimony by Pietroburgo, Morgan's supervisor, regarding Medley (Morgan's replacement) hiring "younger individuals"; and (3) testimony by Bagby concerning the demotion of three younger employees who, according to Morgan, were treated more favorably than he.

Direct evidence "refers to the *causal strength of the proof*," Richardson v. Sugg, 448 F.3d 1046, 1058 (8th Cir. 2006), meaning such evidence "must be strong enough to show a specific link between the [alleged] discriminatory animus and the

challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision," Schierhoff v. GlaxoSmithkline Consumer Healthcare, L.P., 444 F.3d 961, 965 (8th Cir. 2006) (alteration in original) (internal quotation omitted).  This category of proof "includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." Id. at 966 (quoting Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993)).  Direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Radabaugh, 997 F.2d at 449 (internal quotation marks omitted).

With these principles in mind, we conclude none of Morgan's proffered evidence constitutes direct evidence of age discrimination.  First, with regard to the comments allegedly made by agents of A.G. Edwards that the company was transitioning to a younger workforce, Morgan cites only to the deposition testimony of himself and Emile Bizot (Bizot), a non-management employee.  A review of Bizot's testimony indicates Bizot lacked personal knowledge of the management decisions about which he was questioned, gave vague and ambiguous testimony regarding his observations, and made no reference to specific conduct or statements by persons involved in the decision to demote Morgan that could be characterized as reflecting a discriminatory attitude.  Similarly, Morgan's testimony, based solely on unsubstantiated hearsay, fails to identify the source of his information that certain older employees of A.G. Edwards felt they were being forced out.  Such evidence falls short of demonstrating a specific causal link between the alleged discriminatory animus and the challenged decisions sufficient to support a finding Morgan's age actually motivated A.G. Edwards's decision to demote Morgan.

Second, Pietroburgo's testimony does not constitute direct evidence of discrimination. Pietroburgo testified regarding his knowledge of Medley's actions as

a branch manager, stating, "It was pretty clear to me [Medley] was transitioning the branch. He was getting younger individuals–I shouldn't say younger. He was getting other individuals involved in management." However, Pietroburgo merely was describing his perceptions of Medley's management decisions within Medley's own office, and Medley indeed was the oldest in his office. We cannot see how Pietroburgo's reflective depiction of Medley's conduct, which occurred in a different environment than the one in which Morgan worked, forms the requisite causal link between any alleged discriminatory animus and Morgan's demotion.

Finally, we reach a similar conclusion with regard to Bagby's testimony concerning the demotion of three younger A.G. Edwards employees, who Morgan alleges were treated more favorably than he. Morgan bears the burden to demonstrate these employees were similarly situated to him, a showing we repeatedly have characterized as "rigorous." EEOC v. Kohler Co., 335 F.3d 766, 775 (8th Cir. 2003). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id. at 776. Morgan fails to make this showing. Two of the individuals with whom Morgan compares himself, Ben "Tad" Edwards and Pietroburgo, reported to a different supervisor and held higher-level positions than Morgan. Although the third individual, George Grimes (Grimes), reported to Pietroburgo (as did Morgan), Grimes held a different position than Morgan. Morgan alleges Grimes was told of Grimes's performance problems and was given an opportunity to improve; however, Morgan received no similar notice of deficiency. We disagree with Morgan's characterization of his employment history. Indeed, Morgan was notified on numerous occasions over a lengthy time regarding performance issues related to his management style, his inaccessibility to his supervisors and branch managers, and his poor office attendance.

Morgan also contends he was the only employee asked to sign a non-compete agreement to continue his employment as a financial consultant with A.G. Edwards, and the other three younger demoted employees were not required to sign similar

agreements. We reject Morgan's unsubstantiated allegation. According to A.G. Edwards, it did not require Morgan to sign such an agreement to continue working as a financial consultant; rather, its discussion of Morgan signing the agreement occurred in the context of negotiating a proposed severance agreement, which Morgan requested. Beyond his own allegation, Morgan fails to provide any evidence sufficient to withstand a motion for summary judgment that A.G. Edwards required him to sign a non-compete agreement simply to continue working for the company.

Because Morgan failed to present any direct evidence of age discrimination, the district court properly analyzed Morgan's claim under the burden-shifting framework of McDonnell Douglas.

### 3. Morgan's Ability to Establish a Prima Facie Case

Morgan challenges the district court's conclusion that he failed to establish a prima facie case of age discrimination given Morgan was not "replaced by someone substantially younger." Haas, 409 F.3d at 1035. The district court found it was undisputed Morgan was replaced by Medley, who was four years older than Morgan, and while some speculated Medley would be retiring soon, no evidence indicated Medley planned to do so or had informed anyone of such a plan. Attempting to bypass the general rule of showing replacement by a younger employee, Morgan alleges A.G. Edwards temporarily replaced Morgan with Medley as a mere subterfuge to insulate A.G. Edwards from potential liability for age discrimination. In support of his argument, Morgan offers evidence that following oral argument of this case, Medley retired as regional manager on November 17, 2006, approximately three years after replacing Morgan.

Notwithstanding Medley's alleged abbreviated term as regional manager, we decline to view this fact or inference purely as evidence of A.G. Edwards's intent to thwart Morgan's age discrimination claim. Although some courts have allowed plaintiffs to establish a prima facie case of age discrimination where the plaintiff's replacement is older, those courts typically have required the plaintiff to put forth

-14-

additional evidence supporting the notion the older replacement worker was a mere subterfuge to protect the employer from liability under the ADEA.  See Greene v. Safeway Stores, Inc., 98 F.3d 554, 560-62 (10th Cir. 1996) (concluding a 52-year-old plaintiff, who was replaced by a 57-year-old employee, presented sufficient evidence the plaintiff's age was a motivating factor in his termination, where (1) within twelve months of installing a 42-year-old president, eight top-level executives over the age of 50 were replaced by younger employees; (2) the company's new president had made several statements to the plaintiff suggesting age bias; and (3) the plaintiff's older replacement had announced plans to retire and was surprised he was selected to replace the plaintiff); Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1499-1501 (11th Cir. 1991) (finding a 50-year-old plaintiff, who was told he had been around "too long," was "too old," and was "making too much money," established a prima facie case of age discrimination despite being replaced by an older employee, given the initial older replacement employee resigned after only one day and was replaced by a 24-year-old trainee).

We decline to follow the approach of Greene and Alphin because the present case lacks sufficient evidence supporting the notion A.G. Edwards chose Medley as Morgan's replacement merely to gain a tactical advantage in any future litigation with Morgan.  Unlike Greene, there is no evidence A.G. Edwards's top executives were being systematically forced out and replaced by younger employees.  At the time of Morgan's demotion, four of the thirteen remaining regional managers were older than Morgan, and two more were within five years younger than Morgan.  There also is no evidence of any statements made to Morgan during his employment suggesting any intent to discriminate on the basis of age.  Furthermore, Medley emphatically testified during his deposition he "never, ever communicated to anyone that [he] wanted to retire any time soon."  When Medley interviewed for the position of regional manager, he stated he would work as long as his health remained good, for at least three years, and, if the company was happy with him, perhaps as long as five or ten years.  True to his word, Medley remained in the regional manager position for over three years before retiring.

-15-

In reaching this conclusion, we express no opinion regarding whether a plaintiff's inability to show he was replaced by someone substantially younger is an absolute bar to establishing a prima facie case of age discrimination. Rather, we merely hold, under the circumstances of this particular case, Morgan fails to put forth sufficient evidence demonstrating A.G. Edwards intended to discriminate against him on the basis of age. Because Morgan has not established a prima facie case of age discrimination, summary judgment is appropriate.

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of A.G. Edwards.

_____