# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3858

_____

Lee A. Davis, M.D.,            *

           Appellant,      *

                          *     Appeal from the United States
         v.                 *     District Court for the
                          *     Eastern District of Arkansas.

Jefferson Hospital Association, dba    *
Jefferson Regional Medical Center;    *
Robert P. Atkinson, CEO Jefferson     *
Regional Medical Center; Lon Bitzer,   *
M.D.; Shabbir Dharamsey, M.D.;       *
Horace Green, M.D.; David Lupo,      *
M.D.; Charles Mabry, M.D.; M. Bilal   *
Malik, M.D.; Reid Pierce, M.D.;       *
Ruston Pierce, M.D.; James Alan      *
Pollard, M.D.; Ron Pritchard, M.D.;    *
JoAnn Mays,                    *

                           *
          Appellees.      *

_____

Submitted: January 12, 2012
Filed: July 12, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Dr. Lee A. Davis filed this action against Jefferson Hospital Association, doing business as Jefferson Regional Medical Center (JRMC); JRMC Chief Executive Officer Robert P. Atkinson; and 12 physicians at JRMC (collectively, "the defendants"). In his amended complaint, Davis alleged, *inter alia*, race discrimination and retaliation, in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act (ACRA), and conspiracy to interfere with his civil rights, in violation of 42 U.S.C. § 1985(3). The district court[1] granted summary judgment to the defendants and dismissed all of Davis's claims. Davis appeals the dismissal of his § 1981, § 1985(3), and ACRA claims. We affirm.

## I. *Background*

Davis, an African-American cardiologist, obtained medical-staff privileges at JRMC in 2003. Article 2.1 of the JRMC Medical Staff Credentialing Policy provides:

> General Qualifications—Medical staff appointment . . . and clinical privileges are privileges extended by the hospital, and not a right of any individual. Continued exercise of any such status or privileges is contingent upon compliance with the Medical Staff Bylaws, this policy, and staff and hospital rules. Appointment to the staff and associated clinical privileges shall be extended only to professionally competent physicians and dentists who continuously meet the qualifications and requirements set forth in this policy, conform to the standards of patient care imposed by law and herein, and continuously demonstrate an ability to work harmoniously with others in the orderly rendering of quality patient care. . . .

From 2004 to 2006, Davis was involved in several disputes with JRMC staff in which staff alleged that Davis made abusive, sexually offensive, profane, or derogatory remarks. In August 2004, Sherry Yeggy-Nail, a registered nurse, filed a

---

[1]The Honorable D. Price Marshall, Jr., United States District Judge for the Eastern District of Arkansas.

written complaint against Davis for his use of "hostile and abusive language." In November 2005, Morie Mehyou, an administrative employee at JRMC, reported that Davis called him an "idiot." On January 25, 2006, at least seven hospital employees complained that Davis had lashed out at an entire floor of nurses with hostile and inappropriate language. A family member of a JRMC patient also filed a written complaint that Davis was "inappropriate" and "rude" to the nurses on the floor. Davis admitted that he used profanity with JRMC staff.

Several JRMC personnel also reported that Davis made threats or tried to intimidate them. In February 2006, Wendy Green, Lead Compliance Auditor at JRMC, reported that Davis said "he was going to make bad things happen" to another doctor at JRMC. The next month, Angela Bryant, an administrative assistant, expressed concern that Davis "ha[d] become paranoid and ha[d] gotten out of control with his behavior." Also in March 2006, Manager of Admissions Brian Miller reflected on an encounter that he had with Davis, which he viewed as "an attempt to intimidate [Miller]." On April 3, 2006, Dr. Reid Pierce reported that Davis asked him how he was doing, to which he responded, "Fine." Davis then said, "You won't be for long."

On May 16, 2006, the JRMC Credentials Committee, which reviews medical staff privileges at JRMC, informed Davis that it would be investigating his conduct. The Invasive Procedures Committee also referred "quality of care issues" involving Davis to the Credentials Committee. Quality of care issues included "lack of response to nurse calls for patient care matters; inadequate response times to patients admitted to critical care units; assigning call response to his AHP nurse; poor documentation on patient records . . . ; [and] refusal to abide by the request of leadership to remedy poor charting." "[T]he final result of that initial investigation was a corrective action [plan]." The plan directed Davis not to "use threatening or abusive language," "use degrading or demeaning comments," "use profanity or similarly offensive . . . language," "make inappropriate physical contact with another individual that is

-3-

threatening or intimidating," or "make derogatory comments about the quality of care being provided by the Hospital." The plan also required timely and accurate maintenance of records, quick response to calls from medical staff, submission to random drug tests, and participation in an approved anger management course.

According to Dr. David Lupo, Credentials Committee Chairman, Davis "failed to comply" with the corrective action plan. On December 18, 2006, the Credentials Committee "voted unanimously to approve the suspension of clinical privileges for [Davis] for non-compliance with the Committee's requirement to select an approved Behavior/Conduct Course . . . until such time that he fully comes into compliance." JRMC's attorney met with the Credentials Committee three days later, and as a result of the meeting, the Committee "table[d] the suspension of clinical privileges for [Davis] until after the first of the year to allow ample time for research."

Thereafter, other quality of care and behavioral issues surfaced. In March 2007, the Credentials Committee appointed a seven-member Ad Hoc Committee to investigate Davis for the second time. During the investigation, the Ad Hoc Committee considered a report by Dr. Charles Mabry, Medical Director of Quality at JRMC, regarding quality concerns surrounding Davis. The report concluded that "[by] any measure, Dr. Lee Davis's care of patients has been in an outlier status."[2] The ad hoc committee also considered a peer review report, which indicated that from

---

[2]Davis proffers evidence in the form of an affidavit by another physician indicating that Davis did not fail to respond in one of the patient cases that Mabry reported. He also includes in the record a self-serving affidavit, drafted in response to a motion for summary judgment, which admits to medical-record delinquencies in 2004 and 2007 but alleges that he was "caught[]up in April 2007." Self-serving affidavits do not defeat a "properly supported motion for summary judgment." *Frevert v. Ford Mtr. Co.*, 614 F.3d 473, 473 (8th Cir. 2010) (quotations and citation omitted). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Id.* at 473–74 (quotations and citation omitted).

August 2006 to March 2007, the number of deficiencies in Davis's medical records were more than five times higher than the average of all other cardiologists at JRMC. JRMC had suspended Davis's privileges twice in 2004 for record delinquencies. A report of cardiac catheterization cases at JRMC indicated that, between 2004 and 2006, diagnostic-only catheterizations comprised a higher percentage of Davis's cardiology procedures than any other cardiologist. The Ad Hoc Committee did not render a judgment "regarding the area of utilization," but noted "that the information provided to the committee was potentially significant and deserved to be reviewed in the peer review process or by outside experts."

"Following a report to the Credentials Committee . . . of the findings of the Ad Hoc Investigative Committee," Davis received a cautionary, fourteen-day suspension. After further review of Davis's patient-death cases, four of which were found to be below the standard of care, the Credentials Committee "recommended that [Davis] have his privileges revoked." Davis exercised his right to appeal the recommendation to a hearing panel consisting of five physicians. Following more than 13 separate hearings over the course of three months, the hearing panel voted unanimously to recommend revocation of Davis's privileges. Davis appealed again to a four-member review panel. The review panel voted unanimously to accept the recommendations of the Credentials Committee and the hearing panel. JRMC's 14-member Board of Directors then voted to revoke Davis's medical-staff privileges for poor quality of patient care, improper medical documentation, and unprofessional behavior.

Davis filed the instant suit in federal district court alleging, *inter alia*, race discrimination and retaliation, in violation of 42 U.S.C. § 1981 and the ACRA; and conspiracy to violate his civil rights, in violation of 42 U.S.C. § 1985(3).[3] The final scheduling order instructed the parties to complete discovery no later than

[3]Davis does not appeal the dismissal of his due process or § 1983 claims or his claims for tortious interference with a business expectancy.

November 29, 2010. The defendants filed a series of summary judgment motions, ultimately reaching all of Davis's claims. Davis sought a continuance under then-applicable Federal Rule of Civil Procedure 56(f).[4] The district court denied Davis's motion for a continuance and granted the defendants' motions for summary judgment.

## II. *Discussion*

On appeal, Davis argues that the district court erred by entering summary judgment in favor of the defendants on his race discrimination, retaliation, and conspiracy claims and by denying his request for a continuance.

### A. *Summary Judgment*

Davis contends that the defendants are not entitled to summary judgment on his race discrimination, retaliation, and conspiracy claims. "We review de novo the district court's grant of summary judgment." *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005). "Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (quotation and citation omitted). "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and "[w]e review the evidence and the inferences that reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* (quotations and citations omitted).

### 1. *Discrimination Claims*

Davis alleges that the district court erroneously granted summary judgment on his race discrimination claims pursuant to 42 U.S.C. § 1981 and ACRA. "We analyze . . . § 1981 claims . . . and ACRA claims in the same manner." *Id.* When there is no direct evidence of discrimination, "[w]e employ the familiar *McDonnell Douglas*

---

[4]"Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. Pro. 56 advisory committee's note to 2010 Amendments, subdivision (d).

burden-shifting framework to conduct our analysis." *Id.* at 704; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–04 (1973). "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [his] burden of establishing a prima facie case of employment discrimination." *Davis*, 421 F.3d at 704 (quotation and citation omitted). A plaintiff meets this burden "by showing that he or she: (1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) [suffered] under circumstances permitting an inference of discrimination." *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 550 (8th Cir. 2005) (quotation and citation omitted). "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action." *Davis*, 421 F.3d at 704 (quotation and citation omitted). "If the employer meets its burden, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Id.* (quotation and citation omitted).

The defendants concede that Davis is a member of a protected group who suffered an adverse employment action. However, they contend that Davis failed to submit evidence which would permit a jury to infer that discrimination motivated the employment action. They argue that legitimate reasons—not pretext—justified revoking Davis's privileges at JRMC. The defendants argue that they revoked Davis's privileges because of his behavior toward hospital staff, his poor record of patient care, and his failure to maintain proper medical records. Davis argues that he has met the burden of proving his prima facie case because the defendants treated similarly situated individuals who are not African American differently than Davis. He also argues that the court can infer discrimination from the conduct of JRMC staff and from evidence that the hospital violated some of its own policies in revoking his privileges.

### a. *Similarly Situated Personnel*

The test for whether employees are similarly situated "is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing [himself] to the other employees." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). "The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and [have] engaged in the same conduct without any mitigating or distinguishing circumstances." *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1043 (8th Cir. 2007) (quotation, alteration, and citation omitted). Davis contends that several other doctors at JRMC used profanity and made derogatory comments in front of hospital staff. In support, he cites to the results of a survey indicating that three non-African-American physicians at JRMC, like Davis, behaved inappropriately toward JRMC staff.

The record does not show that any physicians Davis identified provided poor patient care or kept insufficient medical records. As the defendants point out, "[t]he fact that [certain doctors] might have been accused of using profanity does not render these physicians similarly situated with Davis." Davis also cites to his verified complaint and affidavit, alleging that "[n]o white physician had . . . been subjected to a 'zero tolerance' corrective action plan" or "random drug testing without cause." While a verified complaint is equivalent to an affidavit for summary judgment purposes, *Hanks v. Prachar*, 457 F.3d 774, 775 (8th Cir. 2006) (per curiam), neither Davis's verified complaint nor his affidavit list any similarly situated, white physicians at JRMC who were treated differently than Davis. Davis alleges in his brief that Dr. Herzog, a white physician, received a temporary suspension approximately 15 years ago that the defendants did not report to the National Practitioner's Data Bank, even though they allegedly reported Davis's suspension. There is no evidence of that in the record, nor is there evidence in the record indicating that Herzog was similarly situated to Davis in all relevant aspects.

Davis also argues that the district court erred by failing to consider 11 affidavits in which individuals testified that he was treated differently than similarly situated white doctors. In fact, only six of the affidavits allege that "certain white physicians" have behaved inappropriately toward medical staff and have not been disciplined. Four affidavits simply state that "other physicians" have behaved inappropriately and have not been disciplined. None of the affidavits include the names of these "other physicians." Nor do the affidavits address patient care or medical recordkeeping—the other two proffered reasons for revoking Davis's privileges. Davis testified in his deposition that he could think of no other physicians who were similarly situated to him.[5]

b. *Conduct of JRMC Physicians*

Davis also contends in his brief that the conduct of two JRMC physicians—Dr. Reid Pierce and Dr. Charles Mabry—is sufficient evidence from which the court can infer discrimination. Davis cites that Pierce encouraged a JRMC employee to "make a written statement [regarding a disturbing conversation she allegedly had with Davis] and send it to [the Chief of Staff]." Davis also alleges that Pierce violated confidentiality by showing a nurse's complaint against Davis to other physicians. Finally, Davis contends that, after Pierce received a "third-party report of an offensive sexual conversation between Davis and a nursing student" while Pierce was Chief of Staff, he launched a quick investigation into whether Davis had sexually harassed the student. The court cannot infer discrimination from these facts. Moreover, it is undisputed that Pierce could not vote on the Credentials Committee and had no power

---

[5]Davis cites statements from his coworkers indicating that he was a good physician. These statements are not relevant to his discrimination or retaliation claims. "It is not the role of this court to sit as a super-personnel department to second guess the wisdom of a business's personnel decisions." *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003) (quotation, alteration, and citation omitted). The issue is not whether JRMC should have revoked Davis's privileges, but whether its decision to do so was discriminatory or retaliatory in nature.

to make official recommendations to the Committee. Thus, Davis has failed to show how the revocation of his privileges, a decision made by the Credentials Committee and affirmed by the hearing panel, review panel, and Board of Directors, was the result of race discrimination.

Davis alleges that Mabry discriminated against him because of race. Mabry filed a formal complaint against Davis for "slanderous comments made by Dr. Davis in [the Invasive Procedures] committee [meeting]." As Medical Director of Quality at JRMC, Mabry also developed a presentation for the Credentials Committee, which indicated that Davis's patient care and medical recordkeeping were substandard and that Davis overused "invasive cardiac procedures, as opposed to more traditional diagnostic and therapeutic measures." The filing of a complaint is not discriminatory of itself. *See Soto v. Mineta*, No. 04-70966, 2008 WL 4427788, at *27 (E.D. Mich. Sept. 30, 2008) ("[T]he act of filing a complaint . . . is not discriminatory harassment . . . ."). Mabry's presentation to the Credentials Committee, without more, does not support an inference of discrimination. Davis argues that Mabry's calculations were erroneous, yet he cites no evidence in the record to support that conclusion other than his own affidavit.

### c. *Hospital Policy Violations*

Finally, Davis contends that JRMC failed to follow its own procedures with regard to the complaints against Davis and the disciplinary actions taken against him. First, he contends that the hospital failed to inform him of a written complaint that Registered Nurse Yeggy-Nail made against him in August 2004. It is undisputed, however, that Davis knew of the complaint because he filed a written response to it. He also contends that JRMC failed to use collegial intervention[6] to resolve the issue

---

[6]Although the record does not define "collegial intervention," the JRMC Credentialing Policy states: "Nothing in this policy or the medical Staff bylaws shall preclude collegial *or informal* efforts to address questions or concerns relating to an individuals [sic] practice and conduct at the hospital." (Emphasis added.)

raised in the complaint. The record shows that then-Chief of Staff Dr. Reid Pierce and Dr. Bob Gullett held a collegial intervention, or informal meeting, with Davis later that month to discuss the incident.

Davis also contends that the corrective action plan was overly restrictive because the language "you should be ashamed of yourself" could constitute a violation of the plan, as could certain body language. Davis offers no support for this assertion, nor does he cite language in the corrective action plan indicating that those types of communication would constitute a violation. Davis also complains that the plan required him to undergo anger management counseling and submit to random drug testing. He cites no hospital policy that these requirements violate, nor does he show that others were treated differently.

Davis argues, without support, that the Credentials Committee's vote was taken without notice or an opportunity to be heard. Evidence in the record indicates that JRMC informed Davis in writing when the Committee launched its investigation and invited Davis to address the Committee, which Davis did. Davis argues that the fact that "the entire Credentials Committee would serve as the ad hoc investigative committee" was contrary to the Credentials Policy, "which provides that an ad hoc investigative committee could only consist of up to three (3) persons." The policy actually states that the committee may investigate themselves, appoint an ad hoc committee of three, or appoint another subcommittee.

Davis stated in his deposition that the hearing panel members and review panel members did not discriminate against him. Davis also stated that thirteen of the fourteen members of JRMC's Board of Directors, who affirmed the decision to revoke his privileges, did not discriminate against him.

d. *Conclusion*

Davis has failed to provide any evidence giving rise to an inference that the defendants racially discriminated against him. Thus, the district court did not err in granting the defendants' motion for summary judgment on Davis's race discrimination claims.[7]

2. *Retaliation Claims*

Davis also alleges that the defendants retaliated against him in violation of 42 U.S.C. § 1981 and ACRA. To establish a prima facie case of retaliation, the plaintiff must show "that (1) [he] engaged in statutorily protected activity; (2) an adverse employment action was taken against him . . . ; and (3) a causal connection exists between the two events." *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1146 (8th Cir. 2012) (quotation and citation omitted). "[I]f the plaintiff can establish a *prima facie* retaliation case, the defendant[s] must provide a legitimate, nondiscriminatory reason for [their] decision." *Id.* "If the defendant[s] do[ ] so, the burden then shifts back to the plaintiff to show that the proffered reason was merely a pretext for discrimination." *Id.*

The defendants respond that Davis did not engage in a protected activity. Protected conduct is defined by federal law, which "prohibits a[] [defendant] from discriminating against an employee who 'has opposed any practice' made unlawful by Title VII, or 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' under the statute." *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)). Davis argues that he engaged in protected conduct on November 11, 2005, when he "sent his concerns about Dr. Mabry's and Dr. Reid Pierce's bias and racial

---

[7]Davis relies on the same factual allegations to support his argument that the proffered reasons for revoking his privileges are pretext for discrimination. Although we need not address the pretext argument, these facts would be insufficient to show pretext for the reasons stated *supra*.

discrimination to Tom Harbuck, Executive Vice President, Robert Atkinson, CEO, Jefferson Hospital Association, and Bill Bledsoe, Cardiac Administrator, via a Quality Concern." The only evidence he cites in support is his allegation in the verified complaint.

Even if the complaint were enough to indicate that Davis engaged in a protected activity, he has not established a causal connection between his complaint in 2005 to JRMC administrators and the ultimate revocation of his privileges in July 2007.

### 3. *Conspiracy Claim*

Davis argues that the district court erred in dismissing his civil rights conspiracy claim pursuant to 42 U.S.C. § 1985(3).

> In order to prove the existence of a civil rights conspiracy under § 1985(3), the [plaintiff] must prove: (1) that the defendants did "conspire," (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws," (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of the conspiracy," and (4) that another person was "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3).

*Larson by Larson v. Miller,* 76 F.3d 1446, 1454 (8th Cir. 1996). "The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based invidiously discriminatory animus." *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989) (quotation and citation omitted). "Moreover, the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Id.* As indicated *supra*, Davis has

failed to show any racial animus on the part of the defendants. As a result, his § 1985(3) claim fails as a matter of law.[8]

## B. *Request for Continuance*

Davis contends that the district court erred by denying his request for continuance. "We review for an abuse of discretion the district court's refusal to allow further discovery prior to ruling on a motion for summary judgment." *Anuforo v. Comm'r*, 614 F.3d 799, 808 (8th Cir. 2010) (quotation and citation omitted). We "uphold[] the [district court's] decision if the nonmoving party was not deprived of a fair chance to respond to the summary judgment motion." *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1084 (8th Cir. 2009) (quotation and citation omitted). "Under Rule 56(f), a party opposing summary judgment may seek a continuance and postpone a summary judgment decision, but the party opposing summary judgment is required to file an affidavit with the district court showing what specific facts further discovery might uncover." *Anuforo*, 614 F.3d at 808 (quotations and citation omitted).

The district court held a motions hearing in July 2010 to resolve certain discovery disputes. At that hearing, Davis sought to compel certain peer review and credentialing information. The district court granted Davis's motions in part. Davis filed his motion for continuance in September 2010. At that time, Davis's counsel argued that Davis needed the data supporting the mortality tables that the defendants used and relied upon to revoke Davis's privileges—data that Davis did not seek in the prior motions to compel. Davis argued that there was insufficient time to review the volume of data uncovered before the scheduled November 2010 court date. Reviewing the record as a whole, we cannot say that the district court abused its discretion by denying the motion for continuance.

---

[8]Davis's counsel acknowledged at the summary judgment hearing that "if we lose on the race claim, the rest of the claims go away."

### III. *Conclusion*

For the foregoing reasons, we affirm the decision of the district court.

_____