# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2846

_____

Edward A. Chambers, Jr.,

         Appellant,

v.

Metropolitan Property and Casualty
Insurance Company; St. Paul Fire
and Marine Insurance Company,

         Appellees.

Appeal from the United States
District Court for the
District of Minnesota.

[PUBLISHED]

_____

Submitted: May 16, 2003
Filed: December 15, 2003

_____

Before SMITH and HANSEN, Circuit Judges, and READE,[1] District Judge.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, sitting by designation.

Edward A. Chambers, Jr. appeals the district court's[2] grant of summary judgment on his claims of age discrimination, breach of contract, and unjust enrichment against the defendants, Metropolitan Property and Casualty Insurance Company ("Met") and St. Paul Fire and Marine Insurance Company ("St. Paul"). We affirm.

## I.

We view the facts in the light most favorable to the nonmoving party, as did the district court. From 1986 until 1998, Chambers was an employee of USF&G Company in various locations, ending up in Florida. USF&G merged with St. Paul in 1998 and eliminated Chambers' position in the process. St. Paul then hired Chambers as the Director of Procedures and Underwriting Analysis and relocated him to Minnesota in the summer of 1998. The severance plan in effect at that time provided that if St. Paul terminated Chambers within 12 months of this relocation, St. Paul would pay the costs of one more relocation necessitated by the termination. This was amended in March of 1999 to provide relocation benefits if an employee was terminated within 24 months of the initial relocation.

In the summer of 1999, St. Paul announced that it was selling its personal insurance operations to Met as of October 1, 1999. As part of the terms of the sale, many of St. Paul's employees in the personal insurance operations were leased to Met from the closing date of the sale until December 1999. Met had its own existing personal insurance operations employees, and all management positions were already staffed by Met employees. Therefore, the St. Paul management positions were eliminated through the sale, including Chambers' position. Met planned to hire some of the St. Paul employees to facilitate the expansion of its underwriting department

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

as a result of the acquisition. Met's agreement to lease some of the St. Paul employees aided the transition and gave Met time to evaluate its hiring needs. All of the leased employees were scheduled to be terminated from their employment with St. Paul by December 31, 1999. Chambers was retained past the closing date as a leased employee.

Although no management positions were available in Met's underwriting department, Chambers interviewed for other positions. In August 1999, Met's Chief Underwriter and Vice President, Michelle DeWine, interviewed each employee on St. Paul's corporate underwriting staff for nonmanagerial positions. DeWine interviewed Chambers, who was then 51 years old, for a position in the compliance unit. DeWine did not hire Chambers for the position but instead hired Pamela Johnson, an employee who was under 40 years old. Chambers also interviewed with Ken Bokor, Met's Assistant Vice President of Market Strategy, for a position with Met as a market strategist. Three market strategist positions were available, one each in Florida, Minnesota, and Illinois. Chambers was most interested in the position located in Florida but expressed a willingness to work at other locations as well. Bokor did not hire Chambers. Instead, Bokor hired Will Daniels for the Florida position, Tim Smith for the Minnesota position, and Alice Young for the Illinois position, all of whom were under the age of 40.

In each instance, Met set forth a nondiscriminatory reason for its hiring decision. The interviewers perceived Chambers' personality as somewhat aggressive and therefore not the best fit for working with regulators in the underwriting position and not the best fit for the team work required in the Florida market. In Minnesota, Met chose a person with more experience with the particularities of Minnesota's no-fault laws. For the Illinois position, Met chose a woman with less analytical skills but more experience with the Illinois market, and a strength in homeowner product and pricing that was of special interest because Met had acquired from St. Paul a large book of homeowner business in Illinois.

3

On October 11, 1999, Chambers received formal written notice that he would be terminated from his position with St. Paul on December 10, 1999, and he would not be hired by Met. Chambers was not given any relocation benefits in his severance package because the relocation benefit had been eliminated for leased employees when St. Paul amended the plan in September of 1999 in connection with the sale and leasing arrangement with Met. Also, he was required to exercise all vested stock options within 30 days of his termination. Chambers filed a charge of age discrimination with the Equal Employment Opportunity Commission (the EEOC) and the Minnesota Department of Human Rights. The EEOC dismissed his claim and issued him a right to sue letter.

Chambers then filed suit against St. Paul and Met asserting breach of contract, violation of Minnesota law concerning unpaid bonus earnings, unjust enrichment, and age discrimination in violation of both federal[3] and Minnesota law. Met and St. Paul moved for summary judgment on all counts. See Fed. R. Civ. P. 56(c). The district court granted their motion for summary judgment, and Chambers appeals the judgment on the claims of breach of contract, unjust enrichment, and age discrimination.

## II.

"We review de novo a district court's grant of summary judgment, construing the record in the light most favorable to the non-moving party." Heisler v. Metro. Council, 339 F.3d 622, 626 (8th Cir. 2003). Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see

---

[3]Chambers' complaint alleges age discrimination in violation of Title VII, but the district court analyzed it under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34 (2000), and we will do likewise.

4

also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We look to the substantive law to determine whether an element is essential to a case, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

## A. Breach of Contract

Chambers first asserts that St. Paul breached the terms of his severance plan by not paying him relocation benefits. The district court concluded that this claim relates to an employee benefit plan and is therefore preempted by the Employee Retirement Income Security Act of 1974 (ERISA) (codified as amended at 29 U.S.C. § 1001-1461 (2000) and in scattered sections of 26 U.S.C.). Chambers argues against preemption asserting that the relocation benefit was not an employee benefit plan but simply a one-time benefit triggered by a single event. The district court alternately concluded that even if there was no ERISA preemption of the state law contract claim, the contract claim would fail on its merits. Because we agree with the district court's alternate conclusion, we need not address the ERISA preemption issue.

An employee policy handbook may become enforceable as an employment contract in Minnesota if it meets the requirements for the formation of a unilateral contract and is more definite than a mere statement of policy. Elliott v. Montgomery Ward & Co., 967 F.2d 1258, 1263 (8th Cir. 1992) (discussing Minnesota employment contract law). "[E]mployers may modify the terms of contracts created by employee handbooks without great difficulty." Feges v. Perkins Rests., Inc., 483 N.W.2d 701, 708 (Minn. 1992). "An offeror of a unilateral contract always retains the power to

5

modify or revoke the offer so long as the offeree has not begun performance, but retention of that power does not preclude the offer from becoming a contract once accepted by the offeree by tender of performance." Id.

At the time of Chambers' initial relocation from Florida to Minnesota in the summer of 1998, the plan in effect promised to pay him for a second relocation if he was terminated within 12 months of the initial relocation. The plan was amended in March 1999 to provide relocation benefits if terminated within 24 months of the initial relocation. The general information section of the March 1999 plan provides that St. Paul "reserves the right to change coverage and to otherwise change, amend, or even terminate the plans, in whole or in part, at any time." (J.A. at 293.) St. Paul amended the plan again in September 1999 to deal specifically with the reduction in force due to the sale of its personal insurance operations to Met. The September 1999 amendments preserved relocation benefits for employees who were terminated immediately due to the sale to Met but eliminated the relocation benefit for those employees leased to Met and terminated after the closing date of the sale (October 1, 1999) and prior to January 2000.

Chambers was leased to Met, and he received his written notice of termination on October 11, 1999, after the closing of the sale. The September 1999 plan was in effect at that time and provided that Chambers was eligible for lump-sum severance payments but no relocation benefits. We agree with the district court's determination that even considering the employee handbook as a contract in this case, Chambers was not entitled to relocation benefits under the terms of that agreement.

Chambers argues that he was entitled to relocation benefits because he had already begun performance in reliance on that benefit, citing Feges, 483 N.W.2d at 708. The Feges case is distinguishable. The employee in Feges claimed the right to a certain disciplinary procedure that had been listed in the human resources policy manual since she was hired. The employer did not follow the procedure before

6

terminating the plaintiff, claiming it was not bound by the manual because it had retained the power to modify it at will. The court rejected that argument and concluded that retention of the right to amend a handbook does not render it unenforceable and that the employer in that case was contractually obligated to provide the procedure in the manual because it had not exercised its right to amend it. Feges, 483 N.W.2d at 708.

In the present case, St. Paul used its retained power to modify the severance plan, and the benefit Chambers seeks is not available under the plan applicable to him. The September 1999 plan clearly states that it supersedes and replaces any preceding severance plan. Chambers cannot claim reliance on the plan in effect at the time he moved to Minnesota because that plan provided relocation benefits only if he had been terminated within 12 months of his initial relocation. Chambers was not terminated within that 12-month period, and he took no action in reliance on the amended 24-month relocation benefit of the March 1999 plan. We see no reason not to apply to Chambers the version of the plan in effect at the time of his termination notice, and under the express terms of that severance plan, Chambers is not eligible for the relocation benefits he claims.

In addition to the severance plan, the St. Paul Employee Benefits Program booklet provides an incentive bonus plan and a stock ownership plan. The general information section of the booklet states that the employer may not terminate an employee in order to prevent the employee from obtaining a benefit under any of these plans. (J.A. at 293.) Chambers asserts that there is a genuine dispute of fact over whether St. Paul terminated him to prevent his stock options from vesting, to force him to exercise stock options when the market was severely depressed, and to cause him to lose his incentive bonus for the year.

Assuming that the employee handbook amounts to an employment contract under Minnesota law, there is no indication that Chambers was terminated for the

purpose of denying him benefits. To the contrary, he was terminated as a result of a legitimate reduction in force due to the sale of St. Paul's personal insurance operations. Additionally, Chambers was not entitled to an incentive bonus under the terms of the amended plan because he was not an employee at the end of the year as required for a payout under the incentive plan, and the terms of the plan did not provide him a prorated bonus. There is no evidence to suggest that St. Paul terminated Chambers in a bad faith attempt to deny him benefits.

## B. Unjust Enrichment

Chambers asserts that if the employee handbook is not a contract, he should be allowed to pursue recovery of his losses under the theory of unjust enrichment. Chambers asserts that where there is no full agreement concerning the details of his compensation, he should recover the reasonable value of his services, and that by selecting him for termination and refusing him his promised benefits, St. Paul was unjustly enriched. We agree with the district court's conclusion that St. Paul could not have been unjustly enriched by denying him the benefits of relocation expenses, an incentive bonus, or adequate time for his stock options to fully vest where, as a matter of law, Chambers was not entitled to those benefits. Also, the district court correctly noted that Chambers put forth no evidence that St. Paul was enriched at all by compelling him to exercise his stock options at a time when the market price was low. See ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 306 (Minn. 1996) (stating unjust enrichment requires a showing that the defendant knowingly "obtained something of value for which the defendant in equity and good conscience should pay") (internal quotation marks omitted). We conclude that the district court appropriately granted summary judgment on the unjust enrichment claim.

## C. Age Discrimination

Chambers asserts that he established a prima facie case of age discrimination and a genuine issue of fact raising an inference of age discrimination to withstand summary judgment. The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 631(a), prohibits an employer from discriminating on the basis of age if that person is over 40 years old. Age discrimination claims under the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363.03, are considered under the same analysis as claims under the ADEA. Yates v. Rexton, Inc., 267 F.3d 793, 799 n.2 (8th Cir. 2001). Because Chambers did not offer direct evidence of discrimination, we consider this case under the familiar framework of "the McDonnell Douglas three-stage order of proof and presumptions." Mathes v. Furniture Brands Int'l., Inc., 266 F.3d 884, 887 (8th Cir. 2001) (internal quotation marks omitted); see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). This framework requires Chambers to establish a prima facie case of age discrimination, at which point the employer must come forward with a legitimate nondiscriminatory reason for its conduct. Mathes, 266 F.3d at 887. It then becomes the plaintiff's burden to demonstrate that the nondiscriminatory reason offered by the employer was really a pretext for discrimination. Chambers asserts his age discrimination claim against both St. Paul and Met. St. Paul terminated him in connection with the reduction in force brought about by the sale of its personal insurance operations to Met. Chambers' discrimination claim against Met stems from its failure to hire him after the sale. We will consider each claim separately.

To establish a prima facie case of age discrimination resulting from St. Paul's reduction in force, Chambers must show that (1) he is 40 years old or older, (2) he was qualified for the job, (3) he was discharged, and (4) age was a factor in the employer's decision to terminate him. Yates, 267 F.3d at 799. Replacement by a younger person is ordinarily sufficient circumstantial evidence to demonstrate that age was a factor in the termination decision, but not in a reduction in workforce case where those duties either have been eliminated or must be redistributed within the

9

employer's remaining work force.  Id.  Instead, to meet the prima facie burden in the reduction in force context, the plaintiff "must come forward with some additional evidence that age played a role in his termination."  Id.  "A plaintiff may meet the last requirement by presenting either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees)." Hanebrink v. Brown Shoe Co., 110 F.3d 644, 646 (8th Cir. 1997).

Chambers presented the additional evidence that he was one of fifteen employees terminated in his division as a result of St. Paul's reduction in force, and thirteen of the fifteen were over the age of 40.  This does not raise an inference of discrimination because the entire personal insurance operation was sold, and St. Paul terminated all persons employed in that area, regardless of age.  His statistical evidence is meaningless without some analysis of the age of the entire workforce at St. Paul before and after the reduction in force.  See Holley v. Sanyo Mfg. Inc., 771 F.2d 1161, 1167 (8th Cir. 1985) (decrease in number of people over 40 in plaintiff's division not evidence of age discrimination where the percentage of protected employees to total employees and the average workforce age increased); EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 952 (8th Cir. 1999) (noting that an important statistic in a reduction in force case is the difference in the percentage of older employees in the work force before and after the reduction in force).  Chambers has submitted no evidence to make out a prima facie case of age discrimination with regard to the reduction in force.

Chambers also challenges Met's decision not to hire him as a pretext for age discrimination.  A prima facie case of age discrimination under the ADEA in a failure to hire context requires a showing that (1) the plaintiff was in the protected age group (over 40), (2) the plaintiff was otherwise qualified for the position, (3) the plaintiff was not hired, and (4) the employer hired a younger person to fill the position.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  The burden

then shifts to the employer to set forth evidence explaining "'that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). The "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. Chambers was over 40, he asserts that he was qualified for the jobs he applied for, and younger people were selected in each instance. Chambers also asserts that he presented a sufficient basis on which to reject Met's explanations for not hiring him. See id. at 149 (noting that a jury question may be created where there is a prima facie case and "sufficient evidence to reject the employer's explanation").

The district court concluded that Chambers was not qualified for the jobs he applied for and that he did not demonstrate that Met's reasons for not hiring him were false or a pretext for discrimination. We conclude that Chambers was qualified for the jobs, but we agree with the district court's conclusion that he has not raised a question of fact as to pretext. Chambers interviewed for a compliance position and three market strategy positions with Met. For the job in the compliance unit, the interviewer, Michelle DeWine, testified that Chambers was qualified, probably overqualified, because no management positions were available. (J.A. at 163.) For the market strategy positions, Ken Bokor interviewed Chambers and testified that Chambers' "skill sets were aligned pretty well with the skill sets I was looking for." (Id.) Thus, we conclude that Chambers set forth a prima facie case of age discrimination–he was in the protected age group, he was qualified for the positions for which he interviewed, and the positions were filled with younger persons.

We next consider the employer's offered explanations for not hiring Chambers. Met asserted that the younger candidates it hired were similarly qualified but better suited in personality for the job, or they were more qualified than Chambers in specialized areas that were of interest to Met. Where "the employer contends that the

11

selected candidate was more qualified . . . than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." Chock v. N.W. Airlines, Inc., 113 F.3d 861, 864 (8th Cir. 1997). If this comparison successfully challenges the employer's articulated reason for the employment decision, it might serve to support a reasonable inference of discrimination. See id.; Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir.) (en banc), cert. denied, 521 U.S. 1119 (1997). "On the other hand, a comparison that reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of racial [or in this case, age] discrimination." Chock, 113 F.3d at 864.

Ms. DeWine testified that she chose Pamela Johnson, a younger person, over Chambers for the compliance position on the belief that Johnson's demeanor and interpersonal skills were better suited to working with regulators as required in the compliance department. She also noted that Johnson had more specific experience in regulatory compliance. (J.A. at 164.) DeWine admitted that Chambers was qualified but noted that he appeared very intense and assertive in mannerism during the interview, and she felt that Johnson's calmer, more patient style was a better fit for the compliance work. (Id. at 168-69.)

Mr. Bokor interviewed Chambers for nonmanagerial market strategy positions based in Florida, Illinois, and Minnesota. Although Chambers was qualified, each of the jobs went to younger people. Mr. Bokor concluded that the other person in each instance was either more qualified or better suited to the position in some respect. Mr. Bokor selected Will Daniels, who was under the age of 40, for the Florida position. While Chambers had a great deal of past experience in Florida, and Bokor was impressed with his expertise in the Florida market, Daniels was also qualified and was already in Florida so he would not have to be relocated. Daniels had current knowledge of the Florida market, whereas Chambers' experience was a year or so removed, and Daniels already had a working relationship with Met's other

12

departments in Florida, which Chambers did not. Bokor also feared from Chambers' aggressive interview style that Chambers would be too aggressive to fit well with the team in place in Florida. (Id. at 206.) Bokor stated, "you have to be careful that the person's personality fits in with what you're trying to accomplish in that team setting." (Id. at 207.)

Bokor hired Alice Young for the Illinois market strategy position because she had worked in Illinois before, she knew the market, and was "especially strong in homeowner product and pricing." (Id. at 220.) Bokor said that while Chambers' analytical skills were stronger than Young's (id. at 224), Met picked up a large book of homeowner business in Illinois from St. Paul, and thus Young's expertise in that area was of special interest to him. Finally, Bokor hired Tim Smith for the Minnesota position because of his special knowledge of Minnesota's no-fault laws. "Tim [Smith] had worked in the booming claim office for St. Paul . . . and I wanted a very strong claim person in Minnesota because of the nature of that market." (J.A. at 212-13.) Chambers' experience in Minnesota was in the underwriting department. Bokor emphasized his need to have "a real strong claim department to manage Minnesota claims." (Id. at 217.)

Chambers has presented no evidence sufficient to reject these explanations as pretext other than the opinion of his supervisor at St. Paul that he had worked well with others at St. Paul in a managerial context. His evidence demonstrates that as a manager, he was very effective and his reviewers thought highly of his interpersonal skills while he was employed by St. Paul. Chambers points to Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 921 (8th Cir. 2000), for the proposition that his favorable reviews demonstrate falsity in the employment decision where the reasons offered for the adverse action contradict those reviews and his favorable performance evaluations by the company. This reasoning, however, does not transfer neatly to the case at hand because of a difference in the facts. The present case involves two different companies, and the employer who made the favorable reviews is not with the

company accused of discriminating in the hiring decision. Chambers' evidence of favorable reviews while he was employed as a manager by St. Paul is insufficient to demonstrate falsity in Met's hiring decision. The positions available with Met were not managerial and might well have required a different style of interpersonal relations or special knowledge.

Chambers challenges Met's use of subjective criteria as suspect and an indication that the explanations were simply a pretext for age discrimination. We have cautioned against the use of subjective considerations because they are easily fabricated. See McCullough v. Real Foods, Inc., 140 F.3d 1123, 1129 (8th Cir. 1998). In this case, Chambers had more years of experience than the younger candidates because he had been working in the insurance business longer, but otherwise, there was no overall objective disparity in the candidates' qualifications. We cannot say, as in McCullough, that an inference of discrimination arises because the employer chose a clearly less qualified or unqualified individual on the basis of subjective considerations alone. Here, the objective qualifications of the candidates were comparable, and the employer offered a legitimate business consideration to justify the use of the subjective criteria of which personality was a better fit for the job or the existing team. The use of this subjective consideration in this case does not give rise to an inference of discrimination because the plaintiff was unable to cast doubt on the justifications offered by the employer. "[I]t is not the role of this court to sit as a super-personnel department to second guess the wisdom of a business's personnel decisions." Evers v. Alliant Techsys., Inc., 241 F.3d 948, 957 (8th Cir. 2001) (internal quotation marks omitted).

III.

Accordingly, we affirm the district court's grant of summary judgment.

_____