**Nila L. DECHMAN, Plaintiff,**

v.

**STAHL SPECIALTY COMPANY f/k/a Thyssenkrupp Stahl Company, Defendant.**

No. 06–00288–CV–W–HFS.

United States District Court, W.D. Missouri, Western Division.

March 13, 2008.

Larry M. Schumaker, Schumaker Center for Employment Law, P.C., Kansas City, MO, for Plaintiff.

Timothy S. Millman, Berkowitz, Oliver, Williams, Shaw & Eisenbrandt, LLP, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

HOWARD F. SACHS, District Judge.

Before the court is defendant's motion for summary judgment, which will be granted. In Count I plaintiff alleges a violation of the Family Medical Leave Act "FMLA;" in Count II plaintiff alleges a violation of the Age Discrimination in Employment Act "ADEA" due to the elimination of her job and refusal to retain/ recall; in Count III plaintiff alleges similar conduct in violation of the Missouri Human Rights Act "MHRA."[1]

### Background Facts

Plaintiff, Nila L. Dechman, was born on April 12, 1944, and was approximately 61 years of age at the commencement of this action. Defendant, Stahl Specialty Company (formerly known as ThyssenKrupp Stahl Company—"Stahl" or "the company"), operates industrial aluminum foundries in Kingsville and Warrensburg, Missouri.[2] The Kingsville facility is the headquarters for Stahl and the majority of non-production or office personnel, i.e. clerical and professional employees who work at that location. With respect to non-production personnel, Stahl employs both hourly and salaried workers.

Plaintiff was actively employed by Stahl from 1979 to January 17, 2005; she worked as a data processor for approximately 23 years, and during her last three years she worked as a receptionist. As such, plaintiff was considered as an hourly clerical, non-production employee. Stahl had an automated telephone system in place, and during regular business hours outside callers would hear an auto attendant greeting with various prompts; the last of which would permit the caller to press "0" for operator assistance which was routed to plaintiff. Plaintiff would then transfer the call or page the request-

---

1. Plaintiff decided not to pursue the claims asserted in Counts IV and V for failure to transfer under the ADEA and MHRA "in order to streamline and focus this case."

2. Stahl specializes in large, complex, machined aluminum castings and produces parts ranging from 0.5 pounds to 280 pounds. Stahl is a supplier to the automotive and heavy truck industries and supplies aluminum castings for marine, construction, food, and agricultural industry applications.

ed employee. After regular business hours, the telephone system was set up to go into fully automated attendant mode, without the operator option. Answering telephone calls was plaintiff's primary responsibility, and she estimated that she answered over 300 calls a day. Plaintiffs secondary tasks included, among other things, greeting visitors, handling mail, entering restaurant charges, making copies, and compiling and circulating various reports.

On November 17, 2004, the Accounting Department posted an opening for an accounting clerk position that would report to the accounting manager, and would be responsible for all accounts payable activities and other accounting functions as needed. Sharon Quick, the accounting manager, was 44 years of age at the time, and was also the hiring supervisor for the position. Both plaintiff and employee Barbara Fix, who was 44 years of age at the time and had worked for defendant since November 1978, applied for the position. Quick recommended that the position be offered to Fix as the most qualified person for the position. Quick's stated reasons for denying plaintiff's bid were that the accounting position would have resulted in a decrease in pay, and that plaintiff's sister-in-law was currently working in the accounting department. Plaintiff states that notwithstanding the pay cut, she remained interested in the position, and there were other instances of relatives working together in the same department. Nevertheless, plaintiff did not believe that she was denied the job due to age, and she also did not contend that Fix was not qualified for the position.

In November of 2004, Franz Eckl became president of Stahl; he was 39 years of age at the time and had worked for the company since 1998. Eckl remained president until December 31, 2006. One of his tasks as president was to make the compa-

ny financially stable so that it could ultimately be sold. Toward that end, in December of 2004, Eckl sought to downsize and reduce costs through the elimination and consolidation of various positions within the workforce. According to the evidence presented, Eckl decided that the receptionist position could be eliminated because it was not necessary and elimination would reduce costs; plans were then made to change the automated telephone system so that it could go fully automated without operator assistance. Ken McAninch, the information systems manager, was responsible for the telephone system. In December of 2004 he made initial changes in the phone system in an effort to route calls more efficiently and to reduce the number of calls sent to the operator. Plaintiff was asked to track the number of emergency calls received by employees, and by e-mail dated January 12, 2005, Gary Nelson, the Human Resources Manager who was plaintiff's direct supervisor, advised employees that future paging of production workers would be discontinued.

Five days later, on January 17, 2005, plaintiff worked a half day before leaving work due to feeling sick. During the lunch hour, plaintiff went to a medical clinic where she was diagnosed with pneumonia and directed to the hospital. Plaintiff was admitted into the hospital that day and was discharged on January 20, 2005. Her doctor permitted her to return to work on Monday, January 24, after a week's absence. Although Nelson did not recall plaintiff informing him of her hospital stay, he admitted that plaintiff had always advised him when she was going to miss work. Sue Jackson, a human resources staff member, knew of plaintiffs hospitalization and checked on her on two occasions.

During the week plaintiff was absent from work, Eckl asked McAninch to try

out the new system. After confirming that the system worked without operator assistance, Eckl decided to immediately eliminate the receptionist position. When plaintiff returned to work on January 24th, Nelson advised her that her position was eliminated and that she would be placed on indefinite layoff effective the same day. Nelson also advised plaintiff that after checking with various other departments he was unable to find alternate work for her; plaintiff questions whether other work for her was considered.[3] According to Nelson, once on indefinite layoff, the employee receives all accrued benefits and is off payroll; usually the employee is released on the spot with no expectation of returning to work.[4]

Defendant states that upon her return to work on January 24th, plaintiff supplied a doctor's note, and after she was advised about her layoff status, plaintiff completed the top portion of an Employee Request Slip requesting vacation time for the period she was sick; plaintiff did not complete that portion of the slip requesting FMLA leave. Nelson did not recall knowing that plaintiff was in the hospital until she returned to work and advised him, and he did not recall telling Eckl that plaintiff was in the hospital prior to her return to work. Eckl essentially concurs, but plaintiff disputes that neither Nelson nor Eckl knew she was hospitalized. Plaintiff also disputes Eckl's claim that plaintiff's illness was not a determining factor in the decision to eliminate the receptionist position.

In February, 2005, plaintiff inquired about continuation of insurance coverage and Nelson advised her that if she retired by April 1, 2005, health insurance coverage would continue until she reached 65 years of age, however, if she remained on a layoff status, she would be eligible for COBRA coverage for only 18 months. In early March, 2005, Nelson advised plaintiff that he did not anticipate plaintiff being recalled to work, and plaintiff elected retirement effective May 1, 2005; however, she began work at Wal-Mart on April 11, 2005. Defendant did not replace plaintiff as a receptionist and has not hired a receptionist or switchboard operator since plaintiff's employment was terminated. Instead, defendant has utilized a full auto attendant greeting without an operator option. Upon arriving at the reception area visitors can sign in and use a phone directory to call the person they are visiting.

Neither Eckl nor Nelson made any derogatory comments to plaintiff about her age, however she points to the declaration of Nancy Young who worked in the Accounting Department and stated that Eckl asserted that some of the older employees were not flexible and not willing to change. She claims that Eckl had this stereotype in mind when he decided to eliminate the receptionist position. Although plaintiff complains that defendant continued to employ Marian Heyer, a substantially younger woman, as a receptionist at the Warrensburg facility, plaintiff

---

**3.** Plaintiff states that vacant positions for Production Inspectors were filled with new hires between the ages of 21 and 35. (Plaintiff's Response: ¶ 123). Judy Monteer, approximately 44 years of age, was transferred from a Production Machine Operator position to a Customer Service position, and plaintiff was not considered for a vacancy as an Inventory Control Analyst. (*Id.*).

**4.** However, plaintiff notes that by letter, Nelson stated that she would remain on indefi-

nite lay off for up to 12 months before her status would be changed to separated. (Plaintiff's Response: ¶ 129). Plaintiff further notes that defendant's layoff and recall policy states that in the event of a layoff reasonable possibilities for temporary reassignment would be explored. (*Id.*). Nelson testified that this general policy is not used for office staff, but only for production workers. Reply Suggestions, ¶ 68.

subsequently admitted that Heyer was in fact older than she. Defendant explained that Heyer's employment was continued because although her job title was receptionist, her primary function was production data entry and she assisted Melody Wood, the human resources administrator, with job applications, filing, the petty cash box, and opening and closing production jobs. Defendant further states that Heyer did not use a telephone switchboard console at her position because all outside calls were routed through the Kingsville facility. In any event, in November, 2005, Heyer's workload was reduced, and she was also laid off.

Defendant states that during 2005, six non-production employees were laid off as a result of position eliminations. Plaintiff notes that four of the six employees were over the age of 40. The other two employees, Lance Carroll and Angela Lord, were under the age of 40, and plaintiff claims that rather than as a result of position elimination, Carroll's employment as an engineering technician was terminated due to performance reasons—as supported by the fact that defendant did not eliminate the position, but hired a new engineering technician. As to Lord, plaintiff states that she was hired on a temporary basis, i.e. an on-call restaurant employee.

Defendant states that although plaintiff identified 15 positions that allegedly she could have transferred into, these positions were mainly management, production, and accounting positions, and she ultimately chose not to apply. Defendant further states that none of the listed positions were in a data processing or receptionist position, where plaintiff had experience. Plaintiff explains that her decision to forego submitting an application for other available positions was based on her understanding that there was no hope of her returning to work. Plaintiff also claims that several of the listed positions do con-

sist of data processing work. While defendant notes that plaintiff never worked in any of the listed positions, plaintiff points to several younger employees who were either hired for or transferred into positions in which they had no previous experience. Defendant points to several individuals over the age of 40 hired by Eckl between November 1, 2004 and November 1, 2005, into salaried positions.

### Analysis

### I. Standard of Review for Summary Judgment

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Chambers v. Metropolitan Property and Cas. Ins.*, 351 F.3d 848, 853 (8th Cir.2003); *quoting*, Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Chambers*, at 853; *quoting, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law is considered to determine whether an element is essential to a case, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Chambers*, at 853: *quoting, Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 565 (8th

Cir.2000). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Id.*

## II. *FMLA*

The FMLA entitles eligible employees to take a total of 12 weeks of leave during a 12–month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 977 (8th Cir.2005); *quoting,* 29 U.S.C. § 2612(a)(1)(D). When an employee completes her FMLA leave, she is generally entitled to be restored to the position she occupied before she took leave. *Id; quoting,* 29 U.S.C. § 2614(a)(1). However, an employee's restoration rights are limited, in that no employee taking FMLA leave is entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.; quoting,* 29 U.S.C. § 2614(a)(3)(B).

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. *Id.; quoting,* 29 U.S.C. § 2615(a)(1). A violation of this provision creates what is commonly known as the interference theory of recovery. *Id.; see also,* 29 U.S.C. § 2617, The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.; quoting,* 29 U.S.C. § 2615(a)(2). A violation of this provision creates what is commonly known as the retaliation theory of recovery. *Id.*

There is no dispute that on January 17, 2005, plaintiff worked half of the day, began feeling sick, and reported to a nearby medical clinic at which time she was diagnosed with pneumonia and directed to the hospital. Although plaintiff did not directly notify Nelson or Eckl about her illness, she testified that immediately after she was directed to go to the hospital, she called Stacey O'Hare and advised her that she was going to the hospital. (Plaintiffs Response: ¶ 108). Plaintiff also testified that during her hospital stay she was called on two occasions by Sue Jackson from Human Resources. (*Id.*).

■ Defendant states that plaintiff never requested or submitted an application for FMLA leave, even upon her return to work. (Defendant's SOF: ¶ 112). It has been held that an employee is not entitled to FMLA leave unless he notifies the employer that "he plans to take FMLA leave". *Wilde v. City of Lincoln,* 2007 WL 1309739 * 10 (Mar. 27, 2007). "While the employee does not have to mention FMLA by name, the employee has an affirmative duty to indicate both the need and the reason for the leave," and the employee must inform the employer that the sick leave is needed because of a "serious health condition." *Id.*

■ Plaintiff's assertion of an interference with Family Medical Leave Act rights, in particular the right to return to a particular job, is deficient because she did not seek and would never have utilized relief under that Act. Instead, presumably to obtain payment for sick days, or to preserve sick leave entitlement, she sought rights under defendant's vacation leave policy. Since medical leave rights were never an issue, and were not plaintiff's choice for dealing with her illness, there could be no valid claim of interference with Leave Act rights. In other words, the Leave Act contains no blanket provision

for a right to return from all serious illnesses (even those that might have qualified under the Act if that was what plaintiff had been seeking). The Leave Act is tailored to rights to medical leave when assistance based on *illness* is the subject of the claim, or potential claim.

■ I note there is law to the effect that where a plaintiff has both paid and unpaid sick leave rights she is not required to choose the plan that protects her rights to return to her job. Particularly during a period of illness, presumably deeply distracting, an employee is not required to familiarize herself with all legal rights and select the most advantageous course. See e.g. *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir.1997). But where an employee rejects all sick leave and absents herself under a vacation plan, she cannot complain of a termination that is lawful during a vacation, simply because she could have taken sick leave. Compare *Sanders v. May Dept. Stores*, 315 F.3d 940, 944–5 (8th Cir.2003) (employee rejected FMLA leave in favor of personal leave).[5]

For what it is worth, I do agree with plaintiff that if she was in fact seeking sick leave rather than vacation leave, or would have pursued such a claim if she had remained employed with defendant, there is a compelling jury question about whether the termination was an interference with Leave Act rights. If so, she would presumably be entitled to compensation for the period between her termination and when a jury would determine she would have been terminated in the absence of illness—which presumably could be three weeks or perhaps nine months.

Defendant points to certain deposition testimony in which plaintiff testified that she did not apply for FMLA leave, and did not intend to do so until she exhausted all of her vacation time. (Defendant's SOF: ¶ 135). It is worth noting that plaintiff further testified that she did not believe she was laid off due to illness or her absence from work; however, she subsequently recanted this testimony. (*Id.*; ¶ 136, pg. 15 n. 3; see also, Plaintiff's Response: pg. 44, n. 18).[6] Purportedly in support of her position that she exercised her FMLA rights, plaintiff points to other testimony in which she stated that she did not think about FMLA leave because she assumed she would be returning to work. (Plaintiffs Response: ¶ 135). This statement actually has the opposite effect, and appears to be an admission that plaintiff herself did not consider her absence to be an FMLA leave.

Further support for defendant's position that plaintiff was not on an FMLA leave is plaintiff's own testimony that while she felt it was an inopportune time for her to lose her job while sick, she "sincerely believe[d] that ... the reason I was let go was because of my age." (Plaintiffs Response: ¶ 136). Nevertheless, plaintiff also testified that when Eckl questioned Nelson about her absence, Nelson informed him that she was on FMLA leave. (Plaintiff's Response: ¶ 140). Even if this occurred, Nelson's confusion would not alter the facts. Summary judgment will be entered against plaintiff on Count I, the FMLA claim.

### III. *Age Discrimination*

■ The purpose of the ADEA is "to promote employment of older persons

---

**5.** Because the facts are spelled out in the papers supporting the motion but the lawyers have not briefed the issue in this fashion, a request for reconsideration would be entertained.

**6.** I read this as a sound opinion that this is not a retaliation case.

based on their ability rather than age," and to prohibit arbitrary age discrimination in employment. *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d 1034, 1041 (8th Cir.2007); *quoting,* 29 U.S.C. § 621(b). Arbitrary age discrimination occurs when an employer denies or reduces benefits *solely* because of employee's age. *Id.*

■ In Counts II and III, plaintiff claims that the elimination of her position, and the failure to retain/recall her violated the ADEA and MHRA.[7] To establish a prima facie case of age discrimination resulting from a reduction in force claim, a plaintiff must show that (1) he is 40 years old or older; (2) he was qualified for the job; (3) he was discharged; and (4) age was a factor in the employer's decision to terminate him. *Chambers v. Metropolitan Property & Casualty Ins. Co.*, 351 F.3d 848, 855 (8th Cir.2003).

■ There is no dispute that plaintiff meets the initial three factors necessary to establish a prima facie case of age discrimination in her layoff that resulted in the loss of her job. There is, however, controversy as to whether there is a *genuine* issue of *material* fact that age was the reason for plaintiff's termination, the fourth factor in a prima facie case. Additionally, since the facts at bar involve a reduction in force as opposed to a claim that plaintiff was replaced with a younger person, plaintiff is required to provide "additional evidence" such as statistical evidence of a pattern of forced early retirement, or provide circumstantial evidence of comments and practices allowing a reasonable inference that a preference for younger workers caused plaintiff's termination.

■ In support of her contention that age was a factor in defendant's decision, plaintiff repeats her claim that the early retirement incentive plan constituted age-based stereotyping. However, this plan was not per se impermissible. *Morgan v. A.G. Edwards & Sons, Inc.*, 486 F.3d at 1040. Next, plaintiff claims that all employees who were terminated as a result of the reduction in force during Eckl's first year at the company were over the age of ·50, i.e. plaintiff, Cheryl McIntyre, Nancy Young, and Marian Heyer. However, this kind of "statistical evidence is meaningless without some analysis of the age of the entire workforce ... before and after the reduction in force." *Stidham v. Minnesota Min. and Mfg., Inc.*, 399 F.3d 935, 938 (8th Cir.2005). Moreover, defendant points out that in addition to the four individuals identified by plaintiff, two other employees, Lance Carroll and Angela Lord, as noted in personnel records, were terminated due to the reduction in force and they were under 40 years of age at the time. (Defendant's Appendix: Tab 8).

If the unimpeached explanation of defendant's witnesses concerning the plan to eliminate plaintiff's position as part of the company's downsizing program is taken as true, there obviously is nothing to prevent granting summary judgment to defendant on the layoff or termination issue, irrespective of possible violations regarding

---

7. Defendant initially contended that this claim, as it alleged a failure to retain/recall, was not mentioned in the EEOC Charge, and therefore, not fully exhausted. (Supporting Suggestions: pg. 27–28). However, plaintiff points out that in the Charge she stated her belief that defendant discriminated against her by failing to consider her for other available work. (Suggestions in Opposition: pg. 104–05 n. 27). Moreover, during its investigation the MCHR questioned defendant about whether plaintiff was considered to work in other departments. (*Id.*). Thus, plaintiff's claims as asserted in the complaint are reasonably related to the allegations in the Charge and investigated by the MCHR. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1123–24 (8th Cir.2006).

McIntyre, Young or Heyer, when their situations are carefully explained. Plaintiff offers nothing that materially or specifically controverts the legitimacy of the plan and the facts concerning its execution, but repeatedly claims there is "an inherent matter of credibility" in the sworn testimony of the witnesses. I recognize procedural traditionalists have long questioned summary judgment practice, or have sought to give it grudging application. Federal practice in recent decades is, however, to the contrary, perhaps increasingly so. I am obligated to follow accepted current practice as set forth in the Rules of Civil Procedure and prescribed by appellate authority.

Illustrative cases may be cited. An Eighth Circuit retaliatory discharge case observes that a disputed complaint of sexual harassment cannot become a jury issue as an alleged cause of discharge in light of reasons for the discharge testified to by a mayor on behalf of defendant city. *Sweeney v. City of Ladue*, 25 F.3d 702, 704 (8th Cir.1994). An asserted right to test credibility before a jury was rejected, and summary judgment was affirmed. Eighth Circuit practice going back at least forty years has been to the same effect. *Lundeen v. Cordner*, 354 F.2d 401, 409 (8th Cir.1966). Judge Floyd Gibson there noted that it would be "virtually impossible" to use summary judgment practice if a "bald objection" to an "affiant's credibility" would be sufficient to get to a jury, absent "specific facts" produced in response to a motion which would impeach the testimony. A recent district court ruling in a product liability case is also illustrative. Where there was medical evidence that a treating physician would have prescribed a product regardless of new information, the patient argued that a credibility determi-

nation was required where there was " 'objective circumstantial evidence' " controverting the testimony. *In re Prempro Products Liability Litigation*, 2006 WL 1981902 (E.D.Ark.). The court denied defendant's motion only because, even accepting the testimony as true, future hypothetical dosages and length of prescribed use were not covered in the testimony.[8]

Because the basic procedural issue is dispositive here, on the cause of the layoff resulting in termination of plaintiff's service with defendant, several additional cases are noted. Over an objection that there were necessarily credibility issues to be decided by a fact-finder, lawyer testimony as to lack of knowledge of the source of certain compensation funds was accepted on summary judgment. *In re Bressman*, 327 F.3d 229, 237–8 (3rd Cir.2003) (in the absence of circumstantial evidence to the contrary, it would be unrealistic to conclude that significant services would be rendered if the law firm knew the source of funding was questionable). See also *Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1312 (10th Cir.2000) (expert property valuation which could have been the subject of cross-examination accepted as true for partial summary judgment).

Plaintiff's contention that the accepted practice comes close to judicial fact-finding has some plausibility; perhaps it may be roughly compared with judicial practice in evaluating evidence for jury submissibility, either before or after verdict. To paraphrase a rather rude remark attributed to Justice Holmes regarding the common law standard of care in negligence cases, when it is too difficult for judges to make the call they leave it to the jury to decide. Of course appropriate respect for the role of the jury should prevail, except in very

---

**8.** The plan to eliminate this plaintiff's job as a phase of downsizing is not materially impeached, and the alleged parallel work by Ms. Heyer was also eliminated. The timing seems related to her absence from the job, and cannot reasonably be connected with her age.

clear cases. Giving the benefit of any doubt to plaintiff, I am satisfied this is a clear case on the absence of age discrimination in the elimination of plaintiff's job.[9]

I have repeatedly denied summary judgments, as a matter of discretion, even when technically possible, if jury use may serve the interests of justice. See *Roberts v. Browning*, 610 F.2d 528, 536 (8th Cir. 1979). There is little about this aspect of the case that suggests sending it to a jury.[10]

*Failure to Transfer or Recall*

■ Plaintiff next contends that despite the alleged applicability of the company's written policy of attempting to find alternate positions for those employees who are separated due to lack of work,[11] as well as Nelson's testimony that he attempted to find other work for her, there were several available positions that were filled with younger workers. In support of her contention plaintiff notes that Jeanne Adams, Melody Wood, and Michael Hawes all testified that Nelson did not inquire about available work for plaintiff. Conversely, at his deposition, Nelson testified that he checked with the department managers of administrative departments to see if there was work available for plaintiff. These would include the sales department, the purchasing department, and the ac-counting department. Adams and Wood were human resource administrators, not department managers, and Hawes was a controller, not the manager of accounting. This is consistent with the Nelson testimony; he did not claim they were questioned about available work for plaintiff.

Plaintiff claims available positions were filled by younger workers, i.e. inventory control analyst, production inspection, and inventory control analyst. In addition to questions of plaintiff's suitability and experience covered by the record, I am unaware of proof that the persons making selections were even aware of plaintiff's availability.[12] Whatever managerial delinquencies may have occurred, the issue of age discrimination as a likely motivation is not adequately pieced together. Nelson's view of appropriate possible placement for plaintiff cannot be second-guessed in litigation, absent a submissible theory that his judgment was tainted by an age-related stereotype. Plaintiff contends that at an office picnic some months after plaintiff's job was eliminated, Eckl stated that "some" older employees were less flexible than younger persons and hard to train. This was in response to Nancy Young's opinion that the company was wrong in its treatment of older workers. (Plaintiff's Exh. 13, Nancy Young Declaration, ¶ 10).

9. Not only is the cause of termination as part of the down-sizing a matter resolvable on sworn testimony, not materially impeached, but the obverse scenario is strange indeed. The danger in age cases is the use of stereotypes about employee performance. It is difficult to imagine use of an unfavorable age-based stereotype regarding a receptionist and switch-board operator, where plaintiff's performance has not been put in question. This consideration is not part of the rationale for ruling for defendant, but does increase my comfort-level with the result.

10. I do acknowledge that the timing chosen by Mr. Eckl was sufficiently callous or unthinking so that the challenge has jury appeal, apart from the age question. Thus the protective role of summary judgment practice has the fortunate coincidental effect of avoiding illicit temptation for a jury.

11. Defendant counters that the stated policy contemplated production workers, i.e. production machine operators, who were temporarily reassigned when there was a lack of work, as opposed to non-production workers, such as plaintiff, who were separated for a different reason.

12. These persons appear to have been identified as Phil Ishmael, Darrell Hillard and Richard Bennett. Reply Brief: pp. 11, 12, 19.

Unlike the decision to eliminate plaintiff's job, however, which seems to have been Eckl's decision as a phase of downsizing, the issue of placing plaintiff was entirely left to Nelson.

There is no theory, short of speculation, that Mr. Eckl had any role or any influence in determining the personnel issue relating to plaintiff that arose after he eliminated her position. Nor is there evidence that supervisors or managers other than Mr. Nelson considered plaintiff's qualifications or availability, except for the three he testified he touched base with before he spoke to plaintiff about her prospects with the company. The time frame for her availability was limited to about six weeks in early 2005, from the time her job was eliminated until she elected, out of personal need for long-continuing medical insurance coverage, to take early retirement. Although plaintiff engaged in a commendable wide-ranging discovery effort and vigorous briefing, the result is a diffuse criticism of the defendant company in general, without focusing on a specific set of job opportunities known to Nelson or the managers he said he consulted.

This case has some similarity to the *Sprint* case very recently decided by the Supreme Court. *Sprint/United Management Co. v. Mendelsohn,* —— U.S. ——, 128 S.Ct. 1140, 170 L.Ed.2d 1, 2008 WL 495370 (U.S.) (Feb. 28, 2008). That case dealt with evidentiary limitations outside the proper focus of litigation, while this case involves the substantiality, or lack thereof, of issues beyond the focus on Nelson's conduct during a brief window of opportunity. The claim of another available job (or several such jobs) is lacking in firm specification and adequate supporting proof. It is not enough simply to assert there were opportunities, and the office staff was overworked, contrary to Eckl's view, or that someone not shown to be aware of plaintiffs availability and need for

placement might have offered her a position. Questions about the adequacy of Nelson's "search" are inconclusive, partly because his motivation is not substantially impeached.

It may be noted that the Nelson testimony is not generally suspect, from plaintiff's standpoint, because he left the company in 2005, unhappy with Eckl's regime, which he believed was "trying to put too much pressure on the employees and extra work and consolidation of responsibilities . . ." Nelson Depo, p. 6. Far from favoring his former employer, he gave encouragement to plaintiff to pursue her claim. Nelson Depo, p. 9. But his testimony during the deposition taken by plaintiff did not open the door for her, his responses have not been directly or indirectly impeached, and the most favorable view of the other evidence plaintiff cites does not fill in the necessary chinks.

There is no evidence that Nelson, or the individuals on his staff (Adams, Jackson and Wood), were adversely influenced by plaintiff's age in any effort that was made to obtain a substitute job. Age motivation was denied by Nelson (Nelson Depo, p. 96) and I conclude there is no submissible proof to the contrary.

Plaintiffs case is mainly built on speculation and peripheral facts that do not support an inference of age discrimination impacting on her. A reasonable fact-finder could not find that defendant, through identifiable personnel, intended to discriminate against her on the basis of age. Thus, summary judgment is appropriate as to all counts and defendant's motion will be granted.

Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment (ECF doc. 58) is GRANTED. The clerk of the court is

directed to enter judgment in favor of defendant.